# United States Court of Appeals
# for the Federal Circuit

———————————

**ALLIED TECHNOLOGY GROUP, INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee,*

**AND**

**MONSTER GOVERNMENT SOLUTIONS, LLC,**
*Defendant-Appellee.*

———————————

2010-5131

———————————

Appeal from the United States Court of Federal Claims in Case no. 10-CV-120, Judge Thomas C. Wheeler.

———————————

Decided: June 9, 2011

———————————

FREDERICK W. CLAYBROOK, JR., Crowell & Moring, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were GUNJAN R. TALATI and LINDSAY P. DENAULT.

MICHAEL N. O'CONNELL, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-

appellee The United States. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and KIRK MANHARDT, Assistant Director.

RICHARD L. MOORHOUSE, Greenberg Traurig, LLP, of Washington, DC, argued for defendant-appellee Monster Government Solutions, LLC. With him on the brief were, JACOB B. PANKOWSKI, DAVID P. GOODWIN and WILLIAM M. JACK.

---

Before BRYSON, CLEVENGER, and LINN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* LINN.
Dissenting opinion filed by *Circuit Judge* BRYSON.

LINN, *Circuit Judge*.

This is a post-award bid protest case filed by Allied Technology Group, Inc. ("Allied") against the United States ("government" or "DOJ"), contesting the government's award of a contract for an internet job listing website to intervenor Monster Government Solutions, LLC ("Monster"). The Court of Federal Claims ("Claims Court") granted judgment on the administrative record in favor of the government and Monster (collectively, Appellees), affirming the determination by the Government Accountability Office ("GAO") that the award was proper. *Allied Tech. Group, Inc. v. United States*, 94 Fed. Cl. 16 (2010) ("*Opinion*"). For the reasons set forth below, this court affirms.

## I. Background

### A. DOJ's Request for Quotations

On August 13, 2008, the DOJ issued a draft Request for Quotations ("RFQ") for an automated recruiting and staffing system ("the System"), which performs the basic functions associated with the internet listing of DOJ job postings and the submission and tracking of applications submitted in response to the vacancies.

The draft RFQ contained a number of technical requirements that are discussed below in association with the final RFQ. In addition, it contained two provisions particularly relevant to Allied's protest. First, it required that "[t]he offeror shall highlight any provisions that conflict with the Terms and Conditions outlined in Document B [setting forth the substantive terms of the contract]. Conflicting provisions will be considered as exceptions to the Terms and Conditions of the RFQ." J. App'x 172. Second, it noted that "[t]he offeror is advised that any exceptions taken to the terms and conditions of the RFQ may adversely impact its evaluation rating. The Government reserves the right not to accept any exceptions to this RFQ." *Id.*

The draft RFQ provoked comments from potential offerors, including Monster and Allied. Allied objected to the provision that conflicting terms will be considered as exceptions, noting that "[t]his language does not allow for consideration of alternative terms that meet the agency's needs and suggest[s] that an offeror runs the risk of a proposal being found nonresponsive if any terms in an offeror's standard MSA [(Master Subscription Agreement)] or SLA [(Service Level Agreement)] are highlighted as directed. This would be inconsistent with FAR

[(Federal Acquisition Regulation)] 12, as noted above, and should be clarified."

The DOJ's final RFQ called for an "effective user-friendly web-based application" for initially handling about 11,000 employees, and capable of expanding to cover up to 115,000 employees as other sub-agencies converted to the system. The RFQ included four evaluation factors, listed here with their contribution to the total score: technical merit (60 points), live system demonstration (30 points); past performance (10 points); and price (discussed below).

Regarding price, the RFQ explicitly noted that "[t]he Government considers Technical Merit, System Demonstration and Past Performance factors, when combined, to be significantly more important than Price," but that the final award would be made on the basis of a best value determination, wherein "[t]he total evaluated price will be the determining factor for award where two or more quotes are considered substantially technically equal." If, however, "the Department determines that there are significant technical differences between the capabilities of two or more Offerors, then a more expensive quote may be selected for award where the DOJ determines that the value of the selected quote is worth the price differential."

The technical merit factor included a "Requirements List" detailing 114 technical requirements, each rated as "High," "Medium," or "Low" priority. Three high priority requirements are relevant here. First, the RFQ required that it take precedence over any other agreement between the government and the offeror. Second, the RFQ required compliance with Section 508 of the Rehabilitation Act of 1973, which guaranteed access to the System for people with disabilities under the FAR. The RFQ noted that the contractor "must comply" with the Federal Electronic and Information Technology Accessibility Stan-

dards set forth at 36 C.F.R. § 1194. Moreover, the RFQ required that a Section 508 Compliance Certification be signed by the contractor. Finally, the RFQ required that the System "shall use unique employee identifiers in lieu of social security numbers or other personally identifiable information."

Critically, the final RFQ noted that to be eligible, and offeror must "accept[] each of the requirements, provisions, terms and conditions, and clauses stated in all sections of this RFQ." The final RFQ also maintained the language from the draft RFQ objected to by Allied in a section titled "Part 4 – Additional Documents," requiring that:

> The Offeror shall highlight any provisions that conflict with the Terms and Conditions outlined in Document B. These documents will be reviewed by the Government. Any Terms and Conditions that are considered unacceptable by the Government and cannot be resolved may result in the Offeror being removed from consideration. Conflicting provisions will be considered as exceptions to the Terms and Conditions of the RFQ.

Further, the RFQ warned "that any exception taken to the terms and conditions of the RFQ may adversely impact its evaluation rating." The RFQ noted that "[t]he Government intends to make an award on the basis of initial quotation without the use of discussions. . . . However, the Government reserves the right to use discussions after receipt of quotations if it is considered in the Government's best interests to do so."

## B. Allied's and Monster's Bids

Only Allied and Monster submitted bids in response to the RFQ. Both offerors submitted price plans for systems intended for between 5,000 to 115,000 users. The Contracting Officer evaluated the proposals at the initial anticipated user count of 10,000 to 15,000. Allied's proposed five-year price was approximately $7.0 million, assuming a 30 percent annual prepayment discount. Without the prepayment discount (as called for by the RFQ), Allied's price totaled approximately $11.7 million over five years. Allied's bid contained a section titled "Part 5 – Exceptions." Allied stated:

> [The] nature of the Avue Platform requires that the Avue MSA, signed with all clients, takes precedence over all other agreements/terms and conditions across our entire client base. As such, *Section 18, Order of Precedence*, needs to be removed from the BPA [("Blanket Purchase Agreement")] Terms and Conditions, leaving the MSA as the overriding document. The remainder of the exceptions outlined below flows [sic] from this change.

As described by the Contracting Officer, and not disputed by Allied, the exceptions resolve into the following:

- Allied's MSA would govern the confidentiality of data, the government's rights in data produced under the contract, and the rights of inspection and acceptance.

- Allied's MSA would require that "Any early termination of this Agreement shall not result in a refund or reduction of the Annual Subscription Fees and the

Annual Extranet Fees for that portion of the subscription Period so terminated, regardless of whether such fees are paid on an annual or monthly basis."

- If the government performs penetration testing pursuant to technical requirement 112, Allied would require "extensive financial indemnity coverage."

- Allied would remove the RFQ section requiring monthly payment in arrears.

- Relatedly, Allied would have the Initialization Fee paid up front to take advantage of the 30% discount reflected in its price quote, in conflict with the RFQ requirement that payments be made monthly in arrears.

Aside from these exceptions, it is undisputed that Allied's proposal met all the requirements of the RFQ.

Monster's proposal certified that it would meet all 114 technical requirements for a total five-year price of approximately $3.2 million. In particular, Monster indicated that its "system, training content, and its output" are compatible with Section 508 of the Rehabilitation Act, and also the privacy provision requiring the use of unique employee identifiers in lieu of Social Security numbers. Moreover, Monster submitted the required signed Section 508 Compliance Certification, certifying that its service is in compliance with the Electronic and Information Technology Accessibility Standards, 36 C.F.R. § 1194. In a section titled "PART 5. EXCEPTIONS," Monster included the following overview of its Section 508 compliance:

The information contained within this voluntary Product Accessibility Template ("VPAT") is the result of an independent audit . . . [that] tested the compliance of the Monster Government Solutions hiring

Management – Employer 5.0 ("HM – Employer 5.0") application with the requirements of Section 508 of the Rehabilitation Act of 1972 as Amended (1998).

HM – Employer 5.0 is generally compliant with exceptions to the relevant Section 508 requirements. HM – Employer 5.0 has minor compliance exceptions with the accessibility of forms, text equivalents for non-text elements, and keyboard accessibility.

## C. Contracting Officer's Award Decision

The DOJ established a technical evaluation panel ("the Panel") to evaluate the technical merit of the competing proposals. The members of the Panel scored each product for technical strengths and weaknesses under the criteria of the RFQ. The Contracting Officer received the scores from the Panel, and asked for further comments and descriptions from the members of the Panel. The Panel members then attended the live systems demonstration, and collected past performance scores regarding both companies' products. The Contracting Officer averaged the scores awarded by each member of the Panel for technical merit and the live demonstration and added the average to the past performance scores. The result was a total score for Allied of 85.5/100, and for Monster of 79.49/100.

On August 2, 2009, the Contracting Officer awarded the contract to Monster. In his later-issued memorandum opinion, the Contracting Officer explained his award decision on two independent bases. First, he determined that Allied's exceptions were "a refusal by Allied/Avue to accept material requirements, provisions, terms and conditions and clauses to the RFQ," and determined that

this made Allied's offer "unacceptable from a business standpoint." The Contracting Officer stated that "Monster took no exceptions." Second, and despite Allied's exceptions, the Contracting Officer compared Allied's and Monster's proposals on their merits because they were the only two offerors.

On the merits, the Contracting Officer determined that Monster provided the best value for the project, because Allied's "small technical advantage" could not justify the increased price: "There is no reasonable way to assert that Allied/Avue, receiving a technical score of 5.04% higher than Monster justifies paying more than twice as much, resulting in millions of additional dollars over the five year term of the BPA." The Contracting Officer further noted that because Allied's price was based on the DOJ taking advantage of a 30% up-front payment arrangement, the true price disparity between Allied and Monster was even more than 100%. At the end of his analysis, the Contracting Officer concluded that "even if [Allied's] business proposal were acceptable, which it is not, Monster still presents the best value to the Department."

## D. GAO Bid Protest

Allied filed a post-award bid protest with GAO, challenging the Contracting Officer's finding that Allied's quotation was unacceptable, his finding that Monster's quotation was acceptable, and the methodology of the contract award. The GAO denied Allied's protest because: (1) Allied was put on notice of the risks of taking exception and does not dispute that it took exceptions; (2) the phrase "cannot be resolved" in the RFQ could not reasonably be read to require discussions; and (3) even if it could, this would result in a patent ambiguity within the contract between the discussion requirement and the

statement that the DOJ intended to make the award without discussions, and that Allied's failure to protest this patent ambiguity prior to bidding waived its right to assert that discussions were required. The GAO also rejected Allied's argument that Monster should have been disqualified on the basis of alleged noncompliance with Section 508 of the Rehabilitation Act and the collection of Social Security numbers through USAJOBS. As to the first point, the GAO determined that Allied's statements of compliance, and the determination by the independent consultant that Monster was "generally compliant," did not mandate a determination of unacceptability.

The GAO did not rule on Allied's protest of the best value determination and the alleged procedural deficiencies of the rating system, because it held that Allied was not an interested party and could not raise those issues, since the agency had "reasonably found Allied's quotation to be unacceptable and [Monster's] quotation to be acceptable."

## E. Complaint in the Court of Federal Claims

Allied continued its bid protest by filing a complaint in the Claims Court, making essentially the same arguments it did to the GAO. The Claims Court granted Appellees' motion for judgment on the administrative record, holding that Allied's disqualification and Monster's non-disqualification were proper. The Claims Court agreed with Allied that "there were errors in DOJ's technical evaluation process," but determined that Allied could not show prejudice because the large price gap between Allied and Monster made it impossible for Allied to "reasonably show that it would have received the award in the absence of DOJ's errors." Relying on *Electronic Data Systems, LLC v. United States*, 93 Fed. Cl. 416 (May 13, 2010) and *Data General Corp. v. Johnson,*

78 F.3d 1556, 1563 (Fed. Cir. 1996), the Claims Court reasoned that "[t]he record simply does not suggest that any DOJ errors reasonably could offset the price difference so as to make DOJ's selection improper."

Allied timely appealed.  This court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

Allied's appeal presents three distinct issues: (1) Whether the government was required to engage in discussions with Allied over the exceptions in Allied's offer before disqualifying it; (2) Whether the Contracting Officer properly considered Monster's offer despite its exceptions to Section 508; and (3) Whether the government acted arbitrarily and capriciously in making its best value determination.  We address the first two issues and, in light of our decision, need not address the third.

### A.  Standard of Review

This court reviews the Claims Court's grant of a judgment on the administrative record de novo, applying the same standard over the GAO's decision as did the Claims Court.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1350-51 (Fed. Cir. 2005).  The plaintiff-appellant must show that the Contracting Officer's award "lacked a rational basis," *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009), or "violates to prejudicial effect an applicable procurement regulation," *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988).  The test under the first ground is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Centech*, 554 F.3d at 1037.  The test under the second ground is whether the

disappointed bidder has shown "a clear and prejudicial violation of applicable statutes or regulations." *Id.* To show prejudice, the protestor must show that "but for the alleged error, there was a substantial chance that [it] would receive an award – that it was within the zone of active consideration." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (internal citations omitted).

Whether a government contract is ambiguous and whether that ambiguity is patent or latent are questions of law, reviewed without deference. *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

### B. The Disqualification of Allied's Proposal

### 1.

Allied argues that the RFQ unambiguously requires the Contracting Officer to engage in discussions with an offeror who takes exception to any terms in the contract, before the Contracting Officer may properly disqualify such an offeror from consideration. This is based primarily on the phrase italicized below from an RFQ section titled "Part 4 – Additional Documents":

> Any Terms and Conditions that are considered unacceptable by the Government *and cannot be resolved may* result in the Offeror being removed from consideration.

(emphasis added). Allied interprets this to mean that exceptions "would <u>not</u> be grounds for disqualification <u>unless</u> the conflicts as a whole were thought to be significant enough to warrant disqualification ('may') <u>and</u> could not be resolved through discussions ('cannot be resolved')." Br. of Allied at 22.

Appellees counter that two provisions unambiguously give the Contracting Officer the discretion over whether to engage in discussions. First, in the general quote instructions, the RFQ states:

> [I]nitial offers shall contain the Offeror's best offer from a technical and price standpoint. The Government, however, reserves the right to conduct discussions if later determined *by the Contracting Officer* to be necessary.

(emphasis added). Second, in a section titled "5.0 Discussions," the RFQ stated:

> The Government intends to make an award on the basis of initial quotations *without the use of discussions*. Offerors should therefore submit their most advantageous quote in response to the initial solicitation. However, *the Government reserves* the right to use discussions after receipt of quotations *if it is considered in the Government's best interests to do so.*

(emphases added). Appellees further argue that Allied's interpretation would create a patent ambiguity in the contract—between giving the Contracting Officer the discretion to engage in discussions, but requiring the Contracting Officer to engage in discussions in the case of exceptions—which Allied cannot challenge under the holding of *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) (considering a disappointed bidder's argument on the basis of a patent ambiguity waived for failure to raise it prior to bidding).

Allied makes two arguments in response. First, Allied argues that the Appellees' interpretation would fail to give meaning to the "cannot be resolved" phrase in the

RFQ.  Second, Allied argues that that phrase was added in response to Allied's comments on the draft RFQ.  These arguments are unpersuasive.

The relevant provision of the Draft RFQ read:

> The offeror shall include a copy of any Master Subscription Agreement (MSA), Service Level Agreement (SLA) or any other documentation that the offeror will request the Government to sign in order to receive the offeror's services.  The offeror shall highlight any provisions that conflict with the Terms and Conditions outlined in Document B.  Conflicting provisions will be considered as exceptions to the Terms and Conditions of the RFQ.

In response, Allied stated:

> The draft RFQ requires offerors to highlight any provisions in an MSA or SLA that conflict with the Terms and Conditions in Document B, but states that such conflicting provisions will be considered exceptions to the Terms and Conditions in the RFQ.  This language does not allow for consideration of alternative terms that meet the agency's needs and suggest that an offeror runs the risk of a proposal being found nonresponsive if any terms in an offeror's standard MSA or SLA are highlighted as directed.

The DOJ then added the following:

> These documents will be reviewed by the Government.  Any Terms and Conditions that are considered unacceptable by the

> Government and cannot be resolved may result in the Offeror being removed from consideration.

Allied argues that the only reasonable reading of the amendment is that DOJ wanted to prevent offerors from being found nonresponsive, and so, required discussions. This court disagrees.

The RFQ unambiguously gives the Contracting Officer the discretion over whether to engage in discussions, as seen from the emphasized provisions above. Under Allied's reading, such discretion is eliminated by the offeror's initiative to take exceptions or propose additional terms that the government would find unacceptable. In other words, Allied would allow the Contracting Officer discretion to engage in discussions only when the offer exactly conformed to the RFQ, a situation which would be unlikely to be "unacceptable [to] the Government." However, the "cannot be resolved" provision is activated only when the additional terms are considered unacceptable by the government. Thus, Allied's interpretation fails to give meaning to the provisions above, reserving to the Contracting Officer the discretion to engage in discussions, and is therefore an improper reading of the RFQ. *See, e.g.*, *Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 860 (Fed. Cir. 1997) ("A contract must be interpreted as a whole in a manner that gives reasonable meaning to all its parts and avoids conflicts in, or surplusage of, its provision.").

The DOJ did not remove the objected to provisions; the final RFQ, like the draft, required offerors to highlight any provisions in an MSA or SLA that conflicted with the terms and conditions of the RFQ, and categorized such conflicting provisions as exceptions. Allied, through its comments, has already acknowledged that these provisions may reasonably be read to allow disqualification

where "alternative terms" are proposed in the offer. There is nothing in the added language that necessarily changes the effect of those provisions. The added language does not mention discussions, nor define what is required before the government may properly determine that terms in the offer are unacceptable. Instead, the DOJ answered Allied's objection, warning offerors that a bid proposing alternative terms may well result in its removal from consideration.

In light of this, a reasonable reading of the "cannot be resolved" phrase may be to require discussions where additional terms are proposed, but maintain as exceptions (and thus allow disqualification) conflicting terms between the RFQ and the submitted additional documents. This interpretation is consistent with the rest of the RFQ, which requires offerors to "submit their most advantageous quotes," and their "best offer from a technical and price standpoint" and retains the Contracting Officer's discretion over whether to engage in discussions. We need not go so far as to definitively opine on the meaning of that phrase; it is enough to note that it does not require the Contracting Officer to engage in discussions before disqualifying an offer from consideration.

On a more practical level, the RFQ explicitly states that offerors should submit "complete and acceptable quote[s]," i.e. those which "accept[] each of the requirements, provisions, terms and conditions, and clauses stated in all sections of this RFQ." It makes little sense to reward contractors who choose to submit proposals that fail to conform to the RFQ by requiring the government to engage in discussions with them.

2.

Because discussions were not required by the RFQ prior to disqualification on the basis of unacceptable

exceptions, the only remaining question is whether the Contracting Officer acted rationally in disqualifying Allied on the basis of its exceptions. Allied argues that two of its six exceptions were not "true" exceptions because Allied told the DOJ during clarification that it would agree to payment in arrears for a 30 percent bump in the price. Allied then argues that the Contracting Officer disqualified Allied on the cumulative basis of all six exceptions, and that a determination that any of the six exceptions are not "true" exceptions requires a remand, on the basis of the restriction in *S.E.C. v. Chenery Corp.*, 332 U.S. 194 (1947) that an appeals court must make its judgment "solely by the grounds invoked by the agency[, and] if those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id.* at 196.

Allied's argument rings hollow for three reasons. First, Allied admits that all of its exceptions stem from an insistence that its MSA take precedence over the RFQ. J. App'x at 900 ("The remainder of the exceptions outlined below flows [sic] from this change."). Allied admits that all six exceptions were "material." Br. of Allied at 26. Even if we agreed with Allied that two of its exceptions were not "true" exceptions, affirming on the basis of the other four exceptions would not constitute a new ground for affirmance. It would be an affirmance of Allied's disqualification on the same ground that the Contracting Officer disqualified Allied: because it took a material exception in requiring the precedence of the MSA over the RFQ, that the Contracting Officer considered "unacceptable from a business standpoint." Second, the Contracting Officer did not, as Allied contends, make a finding of unacceptability only on the aggregate of the six exceptions. The Contracting Officer's opinion states:

> It is the opinion of the Contracting Officer that these exceptions are a refusal by Allied/Avue to accept material requirements, provisions, terms and conditions, and clauses of the RFQ, and result in Allied/Avue's quote being unacceptable from a business standpoint.

The Contracting Officer's reference to "these exceptions" is most naturally read as referring to each exception. By analogy, were this court to say, "we affirm the decision of the Claims Court for three reasons," that sentence alone does not necessarily indicate that the affirmance is based on the aggregate of the three reasons. Finally, as this court has stated, "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996). As discussed above, this is explicitly laid out in the RFQ, which requires that "[e]ach Offeror shall submit a complete and acceptable quote in accordance with the instructions contained herein. Such a quote . . . accepts each of a requirements, provisions, terms and conditions, and clauses stated in all sections of this RFQ." There is thus no "substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous findings [by assumption] or inferences removed from the picture." *See Branff Airways, Inc. v. CAB*, 379 F.2d 453, 466 (D.C. Cir. 1967).

Because of our holding that the RFQ did not require discussions prior to disqualifying Allied, we need not determine whether the failure to conduct such discussions was prejudicial to Allied. For each of the reasons discussed above, this court affirms the Contracting Officer's decision to disqualify Allied.

C. The Acceptability of Monster's Proposal

Allied next argues that the award to Monster lacked a rational basis because Monster's alleged exceptions to the RFQ necessarily required its disqualification by the Contracting Officer.

First, Allied argues that the Contracting Officer may not award the contract to an offeror who fails to meet all the requirements of the RFQ, and that Monster did not meet the requirements of Section 508 of the Rehabilitation Act, providing for accessibility to the system for disabled individuals. Next, Allied also argues that Monster failed to meet RFQ technical requirement 107 that the offeror must use "unique employee identifiers in lieu of social security numbers or other personally identifiable information."

1.

Allied attempts to frame the Section 508 issue as whether the Contracting Officer could have waived the requirement of § 508 compliance, and cites numerous statutes, regulations, and the RFQ itself for the proposition that § 508 compliance is mandatory. *See* 29 U.S.C. § 794d(a)(1)(A); 41 U.S.C. § 253b(a); 48 C.F.R. § 39.201; 36 C.F.R. § 1194.2(a); J. App'x at 396 (technical requirement number 72 requires compliance with Section 508). This court agrees with Allied that compliance with Section 508 is mandatory, may not be waived by the Contracting Officer, and that if the Contracting Officer had made an award to a non-complaint offeror, that decision would be subject to reversal.

However, Allied improperly frames the issue. Monster explicitly certified that it was compliant with Section 508, both in the listing of requirements, and by submitting a signed "Section 508 Compliance Certification," which stated, "[t]he quote for products or services in response to this Request for Quotation [x] IS [ ] IS NOT in

compliance with the Electronic and Information Technology Accessibility Standards (36 CFR 1194), specified below, as a minimum." The certification also included the following note after the signature block: "See [Monster's] Exceptions in the previous section."

Where an offeror has certified that it meets the technical requirements of a proposal, the Contracting Officer is entitled to rely on such certification in determining whether to accept a bid, and the offeror's potential failure to comply with the proposal requirements is ordinarily "a matter of contract administration," which does not go to the propriety of accepting the bid. *See Centech*, 554 F.3d at 1039 (citing with approval *In re Orincon Corp.*, B-276704, 1997 WL 402081 (G.A.O. July 18, 1997)) ("[A]s a general matter, an agency's judgment as to whether a small business offeror will comply with the subcontracting limitation is a matter of responsibility, and the contractor's actual compliance with the provision is a matter of contract administration."). "However, where a proposal, *on its face*, should lead an agency to the conclusion that an offeror could not and would not comply with the [applicable requirement], we have considered this to be a matter of the proposal's technical acceptability," which *does* affect the propriety of accepting the offer. *Id.* (emphasis added); *see also In re Spectrum Sys., Inc.*, B-401130, 2009 WL 1325352, at *2 (G.A.O. May 13, 2009) ("[A]n agency may accept a quotation's representation that indicates compliance with the solicitation requirements, where there is no significant countervailing evidence reasonably known to the agency evaluators that should create doubt whether the offeror will or can comply with the requirement.").[1]

---

[1]    Though GAO opinions are not binding on this court, Congress has "empowered [the Comptroller General] to determine whether the solicitation, proposed award, or award complies with statute and regulation,"

The proper framing of the acceptability of Monster's proposal is, therefore, whether the "generally compliant with exceptions" language in Monster's proposal constitutes "significant countervailing evidence reasonably known to the agency evaluators that should create doubt whether the offeror will or can comply with the requirement." *Spectrum*, 2009 WL 1325352, at *2.

This court, consistent with the Claims Court, determines that the Contracting Officer did not lack a rational basis to accept the proposal because the exceptions language does not constitute such countervailing evidence for three reasons.

First, the statement of exception is consistent with Monster's two certifications that its offer would comply with Section 508. Compliance with Section 508 is not an all-or-nothing attribute of a product, requiring perfect compliance or disqualification, as evidenced by the flexible statutory requirement that "the agency . . . shall ensure that the electronic and information technology allows . . . individuals with disabilities who are Federal employees to have access to and use of information and data that is comparable to the access to and use of the information and data by Federal employees who are not individuals with disabilities." 29 U.S.C. § 794(d)(a)(1)(A). This flexibility is reflected in the implementing regulations. *See* 36 C.F.R. § 1194.1 (requiring "comparable" access); 36 C.F.R. § 1194.5 (allowing alternative technologies that "result in substantially equivalent or greater access to and use of a product for people with disabilities").

---

*Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citing 31 U.S.C. § 3554(b)(1)), and this court may draw on GAO's opinions for its application of this expertise.

A reasonable reading of the "generally compliant with minor exceptions" language in the context of the offer as a whole is that Monster certifies that whatever "minor" exceptions it takes, it nevertheless considers its offer to meet the flexible requirements of Section 508. This reading is supported by the note at the end of Monster's Section 508 Compliance Certification, because, in spite of the referenced exceptions in Part 5, Monster nevertheless certified its compliance with Section 508. It was not irrational for the Contracting Officer to credit Monster's representation to determine that Monster met all the requirements of the RFQ. Indeed, as discussed above, the contractor must credit Monster's certification unless there is "significant countervailing evidence." Because nothing in the statutes, regulations, or the RFQ requires that an offer must be considered "non-compliant" simply because it is not "perfectly compliant," the phrase "generally compliant with minor exceptions" does not constitute significant countervailing evidence that should make the agency doubt the offeror's compliance.

Allied argues, and the dissent agrees, that 36 C.F.R. § 1194.2(a) requires a proposal to be perfectly and unequivocally compliant with Section 508 to be acceptable because it requires that "products covered by this part shall comply with *all* applicable provisions of this part." (emphasis added)). This argument presumes that Monster's "minor exceptions" indicate that Monster's service would fail to satisfy some provisions of Section 508, but, as discussed immediately above, Monster may satisfy Section 508 even if it considers itself to have minor exceptions because of the flexibility inherent in the statute.

Second, Monster's statement is not the kind of "significant countervailing evidence" that this court and the GAO have found to require disqualification in light of satisfactory certifications of compliance. For example, in *Centech*, 554 F.3d at 1039, this court determined that GAO's recommendation to the Air Force not to accept

Centech's offer was rational, where a statute required that Centech perform 50 percent of the work itself, and Centech proposed to only perform 43.2 percent (and subcontract the rest). Likewise in *In re MMI-Federal Marketing Service Corp.*, B-297537, 2006 WL 391289 (GAO Feb. 8, 2006), a case cited by Allied, the GAO determined that the agency could not accept without verification the winning bidder's self-certification of compliance with the "Berry Amendment"—requiring that certain products be purchased and treated domestically—where the winning bidder's initial bid called for treatment at a plant in China as the only place in the world where such treatment was performed, and the self-certification was made as part of a modified manufacturing plan. *Id.* at *7. ("[T]he agency's evaluation of Iguana's quotation was unreasonable. Because Iguana's quotation as originally submitted disclosed a manufacturing process in China that violated the Berry Amendment requirements, and because Iguana advised the agency that domestic facilities capable of performing the EXPEL impregnation process were not then available, the agency was required to verify, prior to award, that Iguana's intended manufacturing process would comply with the Berry Amendment.").

This case is easily distinguishable. Monster twice unambiguously certified compliance with Section 508, and the only allegedly contrary evidence to its compliance, a statement that it had "minor exceptions," was within the context of a statement that it was "generally compliant." This is not the kind of evidence that shows noncompliance "on its face." *See Centech*, 554 F.3d at 1039.

Third, the independent audit results reflected in Monster's "Exceptions" section evaluated Monster's service at the time of Monster's bid. The RFQ required that "High" priority components, like compliance with Section 508, be "available upon completion of the transition period, which may be sixty (60) or may be ninety (90) days if the Gov-

ernment chooses to allow a 30-day extension." Thus, even assuming that Monster's service was not sufficiently compliant with Section 508 at the time of Monster's bid, the Contracting Officer had no basis on which to question Monster's certification that it *would* comply with Section 508 at the end of the transition period.

Finally, the identification of the "minor exceptions" occurred through Monster's voluntary decision to obtain an independent audit to ensure compliance with Section 508. Even if Monster was, *in fact*, unable to comply with Section 508, Allied would have had no basis to question Monster's compliance without the benefit of the auditor's report, and the issue of compliance would clearly be one of contract administration. Instead, Monster chose to engage the auditor to receive an above-and-beyond determination of its precise level of compliance, which resulted in a conclusion of general compliance with "minor exceptions." Monster should not be penalized for its admirable attempt at greater precision.

Allied makes two further arguments, which we briefly address here. First, according to Allied, because the Contracting Officer did not find that Monster's exceptions were "minor," neither this court nor the Claims Court could so find without again running afoul of the rule in *Chenery*, 332 U.S. at 196 that "[w]e may not supply a reasoned basis for the agency's action that the agency itself has not given." Second, Allied argues that the Contracting Officer overlooked a significant issue by failing to recognize Monster's exceptions by stating that "Monster took no exceptions," and that "Monster agreed to the terms and conditions laid out in the solicitation." We are not here making a finding that the Contracting Officer did not. Indeed, the Contracting Officer specifically said that "Monster agreed to the terms and conditions laid out in the solicitation." This is consistent with the record, as discussed above, which shows Monster's certification of its compliance with Section 508. As also dis-

cussed above, Monster's statement that its exceptions were "minor" was the only statement in the record regarding the significance or extent of the exceptions, and the self-serving nature of that statement is no different than Monster's or Allied's certifications of compliance with the 114 technical requirements in the RFQ. Far from being the basis of our decision, that Monster indicated that its exceptions were minor is merely support for the Contracting Officer's determination that Monster did not, in fact, take exception. We agree that the Contracting Officer should have discussed Monster's statement of general compliance with minor exceptions. However, the Contracting Officer had a rational basis for considering Monster's proposal.

2.

Allied also argues that Monster failed to meet technical requirement 107, which required that "[t]he system shall use unique employee identifiers in lieu of social security numbers or other personally identifiable information." Allied's support for this is that Monster's service uses USAJOBS (which uses Social Security numbers) "for application processing."

Allied's argument is meritless. First, Monster has certified its compliance with requirement 107, and for the reasons discussed above in connection with Section 508 compliance, the Contracting Officer is entitled to rely on this certification. Second, and more fundamentally, as stated by the GAO and the Claims Court, this requirement does not prohibit the service from collecting Social Security numbers, it only prohibits the use of Social Security numbers as the "unique employee identifiers." Were the system to prohibit the collection of Social Security numbers or other personally identifiable information, the system would effectively be useless because the government could not then connect an application to fill a vacancy to the user. Allied has not asserted any other violation of requirement 107 except the collection of Social

Security numbers. The Contracting Officer thus had a rational basis to accept Monster's certification of compliance with requirement 107.

Because we hold that Allied was properly disqualified, and Monster properly considered, we need not address Allied's contentions that the evaluation was fundamentally flawed and biased towards Monster because it cannot be seriously contended that it was irrational to accept the only acceptable bid.

## CONCLUSION

For the foregoing reasons, this court affirms the Claims Court's judgment on the administrative record, affirming the government's award of the contract to Monster.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

---

**ALLIED TECHNOLOGY GROUP, INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee,*

AND

**MONSTER GOVERNMENT SOLUTIONS, LLC,**
*Defendant-Appellee.*

---

2010-5131

---

Appeal from the United States Court of Federal Claims in Case No. 10-CV-120, Judge Thomas C. Wheeler.

---

BRYSON, *Circuit Judge*, dissenting.

I respectfully dissent based on my disagreement with the portion of the court's opinion that addresses Monster's compliance with section 508 of the Rehabilitation Act, 29 U.S.C. § 794d.

Section 508 requires agencies, when procuring electronic and information technology, to consider the needs

of individuals with disabilities. Specifically, agencies must provide disabled individuals "access to and use of information and data that is comparable" to the access and use provided to individuals without disabilities. 29 U.S.C. § 794d(a)(1)(A). Such access must be provided unless doing so would impose an "undue burden" on the agency. If an agency determines that providing comparable access would create an undue burden, it can provide an alternative means of access to information for individuals with disabilities. *Id.* § 794d(a)(1)(B).

Congress delegated rulemaking authority under section 508 to the Architectural and Transportation Barriers Compliance Board, 29 U.S.C. § 794d(a)(2), which promulgated comprehensive regulations known as the Electronic and Information Technology Accessibility Standards, 36 C.F.R. Part 1194. Those standards prescribe specific design criteria for software and websites, requiring keyboard accessibility, *id.* § 1194.21(a), text equivalents for non-text elements, *id.* § 1194.22(a), and accessibility of forms, *id.* §§ 1194.21(l), 1194.22(n). In addition, section 1194.31 of the regulations provides functional performance criteria, including that "[a]t least one mode of operation and information retrieval that does not require user vision shall be provided, or support for assistive technology used by people who are blind or visually impaired shall be provided." *Id.* § 1194.31.

Although the majority characterizes the comparable access requirement of section 508 as "flexible," the regulations, to which we owe deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), require specific modes of compliance, which were not met in Monster's proposal or in the contracting officer's response to that proposal. The majority is correct that the prescribed modes of compliance need not be

employed if an alternative technology "result[s] in substantially equivalent or greater access to and use of a product for people with disabilities." 36 C.F.R. § 1194.5. However, nothing in the record indicates that Monster's product, Employer 5.0, results in "substantially equivalent or greater access" than a product that is fully compliant with section 508, such as Allied's product.

The main source of flexibility in the regulatory scheme is found in the "undue burden" exception. Section 1194.2(b) of the regulations mandates that "[i]f products are commercially available that meet some but not all of the standards, the agency must procure the product that best meets the standards." 36 C.F.R. § 1194.2(b). Despite that requirement, an agency can procure a less-compliant product if procuring the most-compliant product would impose an "undue burden," *id*. § 1194.2(a)(2), i.e., would impose "significant difficulty or expense," *id*. § 1194.4. In order to take advantage of the "undue burden" exception, the agency must "explain why, and to what extent," compliance would create an undue burden. *Id*. § 1194.2(a)(2).

In this case, the contracting officer made no attempt to explain why compliance with section 508 would create an undue burden. In fact, the contracting officer did not even recognize that Monster took exceptions to the requirement of compliance with section 508. Before discussing Allied's exceptions to contract terms, the contracting officer flatly stated "Monster took no exceptions." He made that statement even though a portion of Monster's proposal was clearly labeled "Part 5. Exceptions" and even though that portion of the proposal clearly indicated that Monster's system, Employer 5.0, was not fully compliant with section 508.

The majority minimizes the importance of that part of Monster's proposal by noting that Monster separately certified that its proposal was compliant with section 508. Although Monster indicated with a checkbox entry that its proposal complied with the Accessibility Standards, the compliance certification contains a note that reads "See [Monster's] exceptions in the previous section," referring to Part 5. That part, in turn, states, "The following represents [Monster's] exceptions to the Section 508 compliance requirement." Two exceptions follow. The first states, "Employer 5.0 is generally compliant with exceptions to the relevant Section 508 requirements." That exception is delineated with a citation to the design requirements in section 1194.22 and the functional performance criteria in section 1194.31. The second exception recognizes the deficiencies in Monster's submission, noting that "Employer 5.0 has minor compliance exceptions with the accessibility of forms, text equivalents for non-text elements, and keyboard accessibility."

Those exceptions involve features that are important to making software and websites accessible to individuals with disabilities. Individuals with visual disabilities access websites with screen readers or Braille displays, devices that convert visual text to auditory or tactile information. Without text equivalents for non-text elements, a blind person may be unable to use a website, even if the website contains only what Monster characterizes as "minor exceptions." For example, if an otherwise compliant website provides a job application form, but the "Submit" button is an image file lacking a text equivalent, a blind person can fill out the entire form yet be unable to submit it because a screen-reading program cannot pronounce the "Submit" button due to the lack of a meaningful text equivalent. Similarly, without keyboard

accessibility, a blind person will be unable to use software or websites that require a mouse.

Although the majority accepts Monster's assertion that its exceptions were "minor," that characterization has no legal effect, because a product that is "generally compliant with exceptions" is still non-compliant under the regulations. *See* 36 C.F.R. § 1194.2(a) (requiring products to "comply with all applicable provisions" of the Accessibility Standards). Regardless of how Monster chose to describe the degree of its deviation from the Accessibility Standards, it is clear that Employer 5.0 does not fully comply with those Standards.

Because Monster's product was not fully compliant with the applicable section 508 requirements and because a fully compliant product (such as Allied's product) was "available in the commercial marketplace," *id.* § 1194.2(b), a straightforward application of the regulations would require that the contracting officer not award the contract to Monster without making further findings. In particular, an award to Monster could be justified if the contracting officer made an "undue burden" determination and provided the required explanation for that determination by explaining that selecting a more compliant product would impose "significant difficulty or expense." *Id.* §§ 1194.2(a)(2), 1194.4. Yet despite Monster's clear statement that it was taking exceptions to the section 508 compliance requirement, the contracting officer did not acknowledge that Monster's proposal was not fully compliant with the requirements of section 508. For that reason, the contracting officer did not conduct the requisite analysis of the "significant difficulty or expense" that would be imposed by selecting a fully compliant product, nor did the contracting officer provide the requisite explanation of why and to what extent insisting on a fully

compliant product would impose an undue burden on the agency.

To remedy the regulatory violation, I would remand this case to give the agency an opportunity to conduct an "undue burden" analysis and, if it found the "undue burden" standard satisfied, to explain why, and to what extent, compliance would impose an undue burden on the agency as that term is defined in the Accessibility Standards. That determination would, of course, be subject to further review. *See, e.g., Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959-60 (Fed. Cir. 1993) (evaluating a price/technical tradeoff analysis developed on remand from a decision granting bid protests). Because that mandatory process was not followed in this case, I would not uphold the award to Monster on the present record.