This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

_____

**DYNCORP INTERNATIONAL, LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, AAR AIRLIFT GROUP, INC.,**
*Defendants-Appellees*

_____

2018-1209

_____

Appeal from the United States Court of Federal Claims in No. 1:16-cv-01704-RHH, Senior Judge Robert H. Hodges, Jr.

_____

SEALED OPINION ISSUED: November 28, 2018
PUBLIC OPINION ISSUED:  December 10, 2018*

_____

AARON MARTIN PANNER, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, DC, argued for plaintiff-appellant. Also represented by DAVID MICHAEL NADLER, Blank Rome LLP, Washington, DC.

_____

  *   This opinion was originally filed under seal and has been unsealed in full.

DOUGLAS GLENN EDELSCHICK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by ROBERT EDWARD KIRSCHMAN, JR., DOUGLAS K. MICKLE, JOSEPH H. HUNT; KATHLEEN D. MARTIN, Office of the Legal Adviser, United States Department of State, Washington, DC.

JONATHAN F. COHN, Sidley Austin LLP, Washington, DC, argued for defendant-appellee AAR Airlift Group, Inc. Also represented by JOEL SINGER, ROBERT JOSEPH CONLAN, JR., KATHERINE L. OLSON.

————————————

Before CHEN, MAYER, and BRYSON, *Circuit Judges.*

PER CURIAM.

DynCorp International, LLC ("DynCorp") appeals a judgment of the United States Court of Federal Claims denying its post-award bid protest. *See DynCorp Int'l, LLC v. United States*, 134 Fed. Cl. 537 (2017) ("*Court of Federal Claims Decision*"). We affirm.

## BACKGROUND

DynCorp was the incumbent contractor on a previous contract to provide worldwide aviation support services ("WASS") to the United States Department of State, Bureau for International Narcotics and Law Enforcement Affairs, Office of Aviation ("State"). WASS activities are part of State's Air Wing, a program which "provides aviation support for the eradication and interdiction of illicit drugs." J.A. 100079. The program also provides aviation support for reconnaissance, medical evacuation, and the movement and security of personnel and equipment. *Id.*

In July 2014, State issued a solicitation which called for the award, on a best value basis, of an indefinite

delivery and indefinite quantity contract to provide flight operations services, aviation logistics services, and aviation maintenance and engineering services for the WASS program. J.A. 100079–87. In January 2015, the agency evaluated the initial proposals submitted by DynCorp and AAR Airlift Group, Inc. ("AAR") and made a competitive range determination that excluded DynCorp. *See* J.A. 125500. Following two protests filed by DynCorp, however, State took corrective action and revised the competitive range to include DynCorp. J.A. 125500–01.

After two rounds of discussions, State evaluated the offerors' final proposals. It empaneled a four-member technical evaluation team, which rated DynCorp's proposal as "unacceptable" for Factor One (Management and Administration), primarily because DynCorp received a deficiency associated with its proposal that the Information Technology Associate Contractor ("IT Associate Contractor"), a separate contractor operating under a separate contract, would maintain the new Management Information System ("MIS"). *See* J.A. 106075, 106079–81, 106667, 110358. On September 1, 2016, the Source Selection Authority ("SSA") awarded the WASS contract to AAR. J.A. 110463; *see also* J.A. 110454–63. The SSA determined that "AAR submitted a [s]uperior technical proposal that met or exceeded all of the technical requirements" of the solicitation. J.A. 110460.

Following the contract award, DynCorp filed a protest with the United States Government Accountability Office ("GAO"), arguing that the WASS contract solicitation "did *not* impose post-transition [MIS] operational and maintenance responsibilities on the [WASS] Contractor." J.A. 124062. Instead, according to DynCorp, while the solicitation required the WASS Contractor to test and implement the MIS, it assigned the IT Associate Contractor "primary responsibility" for maintaining and operating the MIS following the transition from the legacy Air Wing

Information System ("AWIS"). J.A. 124062; *see also* J.A. 125499.

The GAO denied DynCorp's protest, concluding that State's evaluation of the proposals submitted by DynCorp and AAR was "reasonable, consistent with the solicitation, and did not reflect unequal treatment." J.A. 125658. DynCorp then appealed to the Court of Federal Claims, asserting that State's evaluation of its technical proposal was arbitrary and capricious and that State erred in failing to disqualify AAR for soliciting and using DynCorp proprietary information. The Court of Federal Claims rejected these arguments, however, concluding that "[g]iven the judicial standards to be applied in reviewing decisions of a contracting officer, the agency award decision was entirely reasonable and rational." *Court of Federal Claims Decision*, 134 Fed. Cl. at 541. In the court's view, the contracting officer had a reasonable basis for concluding that "DynCorp's proposal was deficient compared to that of AAR," *id.* at 544, because "DynCorp's revised proposal did not address Federal [Information Technology] requirements and did not address important data migration and capture issues," *id.* at 543. The court concluded, moreover, that State's "decision not to disqualify AAR ha[d] a rational basis in the entire record." *Id.*

DynCorp then appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### A. Standard of Review

We review the Court of Federal Claims' grant of judgment on the administrative record without deference. *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011); *see also Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1355 (Fed. Cir. 2015). "In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013); *see* 28 U.S.C. § 1491(b)(4).

## B. DynCorp's Arguments

DynCorp advances three principal arguments on appeal. First, it contends that State acted arbitrarily and capriciously in refusing to disqualify AAR from the procurement for obtaining and using proprietary DynCorp information. Second, DynCorp argues that State misled it into believing that it could permissibly transfer responsibility for MIS operations and maintenance to the IT Associate Contractor. Finally, it asserts that State erred when it declined to disqualify AAR for failing to include a required staffing plan in its proposal. We address each of these arguments in turn.

## C. The Responsibility Determination

Contracting officers are vested with authority to exercise discretion on a wide range of procurement issues, including determinations regarding whether a particular offeror is a responsible offeror.[1] *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334–35 (Fed. Cir. 2001); *see also PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) ("To demonstrate that [a contracting officer's] determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough."). Here, after undertaking an exceptionally thorough review of the record, the contracting officer reasonably decided not to disqualify AAR based

---

[1] The Federal Acquisition Regulation dictates that "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility." 48 C.F.R. § 9.103(b).

upon its receipt of allegedly proprietary DynCorp information. *See* J.A. 126080–103. The contracting officer conducted a document-by-document review of all thirty documents in AAR's possession that contained DynCorp information. J.A. 126081–86. He concluded that twenty of these documents were publically available. J.A. 126081–82. As to the remaining ten documents, the contracting officer determined that they did not contain DynCorp bid or proposal information, J.A. 126083–91, and that AAR did not use any information in those documents "to gain a competitive advantage" in the procurement, J.A. 126092.

DynCorp points to the fact that Anita Hamilton, an AAR employee who had formerly worked at DynCorp, provided AAR with certain DynCorp salary information when AAR was developing its initial bid on the WASS contract. *See* J.A. 126105–06, 126527, 126789–90, 127130–58. Sworn evidence in the record showed, however, that: (1) Hamilton did not consider the DynCorp salary information to be confidential, J.A. 126117; (2) she made only "limited use" of the salary information, J.A. 126117; *see also* J.A. 126091; and (3) the salary information was "from 2010 or earlier," J.A. 126116; *see also* J.A. 126090–91. Further sworn evidence showed that AAR did not ask Hamilton to provide the salary information and that she provided it "on her own initiative during her [temporary] assignment with AAR." J.A. 126117. The contracting officer reasonably concluded, moreover, that AAR did not use the limited salary information provided by Hamilton when it prepared its final proposal, *see* J.A. 126083–84, 126105–06, 126117, 127284, and that AAR obtained no "[c]ompetitive [a]dvantage" as a result of its receipt. J.A. 126084; *see also* J.A. 126091 (noting that "AAR took steps to sanitize [the Hamilton salary] information from future proposal submissions"); J.A. 126101 (concluding that "there [was] simply no evidence that AAR received any type of competitive advantage from any information it

received concerning [DynCorp's] performance under its incumbent contract"). Under such circumstances, the contracting officer had a rational basis for his decision not to disqualify AAR based upon its receipt of the stale DynCorp salary information referenced by Hamilton.[2] *See* J.A. 126083–99.

Likewise unpersuasive is DynCorp's argument that State was required to disqualify AAR because it received a spreadsheet containing DynCorp profit margin analysis ("PMA") information from a DynCorp subcontractor. *See* J.A. 126112–14. With respect to the PMA information, AAR promptly informed the contracting officer that a DynCorp subcontractor had sent one of AAR's independent consultants an unsolicited email with an attachment containing DynCorp PMA information. *See* J.A. 110464. Given that there was no credible evidence that AAR solicited the PMA spreadsheet, *see* J.A. 110504–07, 126112–14, used any of the information it contained, *see* J.A. 110504–07, 126112–14, or gained any competitive advantage as a result of its receipt, J.A. 126086–91, the contracting officer acted well within the scope of his

---

[2] Although Hamilton attempted to obtain certain incumbent contract information from a DynCorp subcontractor in May 2014, sworn record evidence showed that the subcontractor never provided that information. J.A. 126119–20. As the contracting officer reasonably determined, AAR gained "[n]o competitive advantage" and DynCorp suffered "[n]o harm" as a result of Hamilton's unfulfilled inquiry to the DynCorp subcontractor. J.A. 126084. Significantly, moreover, the contracting officer determined that any information obtained from the DynCorp subcontractor would have been immaterial given that "missions [using the DynCorp subcontractor] were eliminated from the [s]olicitation with the issuance of [amendment 5]." J.A. 126091.

discretion in declining to disqualify AAR based upon the PMA information. *See, e.g.*, *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (explaining that "[t]he arbitrary and capricious standard . . . is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors"); *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999) ("Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision.").

On appeal, DynCorp argues that the contracting officer was unduly concerned about whether there had been a violation of the Procurement Integrity Act ("PIA"), 41 U.S.C. § 2102, and failed to assess adequately whether AAR should be disqualified for having created an "appearance of impropriety." *See NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 377 (Fed. Cir. 1986) (concluding that a contracting officer had discretion to disqualify an offeror when he "perceive[d] a strong appearance of impropriety in a situation not precisely covered by the [Ethics in Government Act, 18 U.S.C. § 208(a)]"). We disagree. The contracting officer here properly addressed not only whether AAR violated the PIA, but also specifically considered whether any "appearance of impropriety" tainted the procurement. *See* J.A. 126091 (rejecting DynCorp's allegation that AAR engaged in "'corporate espionage'" and concluding that AAR's receipt of the Hamilton salary information was not "a compromise to the integrity of the acquisition . . . or otherwise demonstrative of poor business ethics"); J.A. 126092 (examining "whether AAR's obtaining and relying upon information relative to [DynCorp's] incumbent contract . . . gave rise to an appearance of an impropriety or otherwise indicated that AAR was not a responsible contractor"); J.A. 126095 ("It is clear to me that AAR did not violate the [PIA] *nor commit any*

*misconduct as it relates to the Solicitation.*" (emphasis added)).

## D. DynCorp's Technical Proposal

DynCorp argues that State led it to believe that it was permissible to shift responsibility for MIS operations and maintenance to the IT Associate Contractor after transition from the AWIS. We do not find this argument persuasive. The solicitation stated that the new MIS would "be proposed by the [WASS Contractor]" and specified that the WASS Contractor would "input and maintain the preponderance of [MIS] data." J.A. 100087. While it is true that the solicitation originally contained a sentence stating that "[t]he IT [A]ssociate [C]ontractor will assume responsibility for the MIS after transition," J.A. 100276, State, in October 2015, issued solicitation amendment five, which deleted this sentence and replaced it with a sentence stating that "[t]he IT [A]ssociate [C]ontractor will support the existing MIS (AWIS) until transition to [the] new MIS is complete," J.A. 103418 (emphasis omitted).

Importantly, moreover, during an August 2014 question and answer session State specifically stated that the WASS Contractor was required to shoulder responsibility for the MIS after transition from the AWIS. *See* J.A. 103342 (explaining that "[o]nce the MIS is successfully tested and implemented, operation and maintenance will remain with the [WASS Contractor]"). State also instructed offerors to include costs for MIS operations and maintenance on a particular line of the performance work statement. *See* J.A. 103399 (explaining that offerors should "assign" costs for MIS operations and maintenance "to [performance work statement] line # 2.C.43.b"); *see also* J.A. 103966 (emphasizing that "[t]he requirements of [performance work statement] sections 2.C.43.b through 2.C.43.e are . . . the contractor's responsibility"). Given State's explicit directive that the WASS Contractor bore

responsibility for MIS operations and maintenance after transition from the AWIS, *see* J.A. 103342, we reject DynCorp's allegation that the agency misled it into believing that it was acceptable to transfer that responsibility to the IT Associate Contractor.

DynCorp argues that four technical evaluation notices ("TENs") which State issued to it during the second round of discussions, *see* J.A. 111557, 111585, 111934, 111936, caused it "reasonably to believe that the IT [Associate] Contractor could handle [operations and maintenance] for the MIS." To the contrary, however, these TENs asked DynCorp to clarify whether or not its proposal included certain MIS equipment and lifecycle support tasks. TEN 137, for example, referred to the radio-frequency identification ("RFID") devices that DynCorp included in the "Distribution Management Technologies" section of its proposal. J.A. 111557; *see also* 105738–39. State noted that the RFID devices were not included "as part of a total MIS solution in the MIS section" of DynCorp's proposal and that DynCorp had not indicated whether it had "included the cost of these requisite system[s] (i.e. tags, readers, and software), installation and configuration labor, and lifecycle replacement costs in the contract." J.A. 111557. State then asked DynCorp to clarify whether the RFID devices were included in its MIS proposal or whether it expected State to purchase the devices. J.A. 111557. Although the TENs cited by DynCorp requested clarification regarding whether DynCorp's proposal included certain MIS-related costs and equipment, they are insufficient to overcome State's explicit instruction that the WASS Contractor, not the IT Associate Contractor, would be responsible for maintaining and operating the MIS after transition from the AWIS, *see* J.A. 103342. Indeed, TEN 130 specifically admonished that "[n]ew MIS activities and any required IT component should be included in the Offeror's proposal." J.A. 112476.

E. Alleged Unequal Treatment

DynCorp contends that State should have disqualified AAR because AAR, like DynCorp, proposed that the IT Associate Contractor would be responsible for MIS operations and maintenance following transition from the AWIS. This argument fails. AAR's technical proposal included "Maintenance and Operations" as one of the "nine major stages" in its MIS solution. J.A. 109390. Its proposal also stated that it would "[o]perate and maintain the [MIS], report defects, make minor enhancements to the system, and conduct periodic reviews." J.A. 109391. DynCorp's technical proposal, by contrast, specifically stated that the IT Associate Contractor would be responsible for MIS maintenance and operations. J.A. 106075; *see also* J.A. 106079–81.

In arguing that AAR proposed to shift responsibility for MIS maintenance and operations to the IT Associate Contractor, DynCorp places great weight on a statement from AAR's technical proposal stating that "[a]s requested by the [contracting officer's representative], we will deliver responsibility for the enterprise [MIS] to the IT Associate Contractor, or other designated personnel." J.A. 108866–67; *see also* J.A. 109388–89.[3] According to Dyn-Corp, the only reasonable reading of this statement is that AAR proposed to transfer responsibility for the MIS to the IT Associate Contractor after the transition from the AWIS was complete.

---

[3] DynCorp also points to four TENs that State issued to AAR during the first round of discussions in October 2015. *See* J.A. 112624, 112628, 112632, 112640. These TENs, however, simply quote language from the original performance work statement, language which was deleted by solicitation amendment five. *See* J.A. 103418.

We do not agree that AAR's statement can reasonably be interpreted in only one way. Given that AAR's proposal specifically stated that "Maintenance and Operations" was one of the "major stages" in its MIS solution, J.A. 109390, State rationally interpreted AAR's statement as simply giving the agency the *option* to direct AAR to shift responsibility for MIS maintenance and operations to the IT Associate Contractor or another designated party. As the GAO correctly concluded, "DynCorp's proposal unambiguously places responsibility for MIS maintenance on the IT [A]ssociate [C]ontractor upon completion of the implementation of the new MIS. In contrast, the agency reasonably interpreted AAR's proposal as assuming responsibility for MIS maintenance, as well as acknowledging that the offeror would transfer such responsibility if requested by the agency." J.A. 125669–70.

## F. AAR's Staffing Plan

Finally, we conclude that, under the particular circumstances presented here, State did not err when it considered AAR's response to TEN 010, *see* J.A. 112759–66, when evaluating its staffing proposal. Although the solicitation contained a prohibition on cross-referencing other proposal volumes, *see* J.A. 100197, it did not prohibit offerors from cross-referencing a discussion response. *See* J.A. 100233 ("If it is determined to be in the best interest of the Government to hold discussions, offeror responses to Evaluation Notices (ENs) and the Final Proposal Revision (FPR) will be considered in making the source selection decision.").

## CONCLUSION

We have considered DynCorp's remaining arguments but do not find them persuasive. Accordingly, the judgment of the United States Court of Federal Claims is affirmed.

**AFFIRMED**