**FURNITURE BY THURSTON, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**DCI, Inc., Defendant–Intervenor.**

No. 11–663.

United States Court of Federal Claims.

Filed Under Seal: Feb. 21, 2012.

Reissued: Feb. 23, 2012.

---

Stephen M. Ryan, McDermott Will & Emery, Washington, D.C., for plaintiff. With him on the briefs was James W. Kim, McDermott Will & Emery, Washington, D.C.

Lartease M. Tiffith, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, and Jeanne E. Davidson, Director, and Donald E. Kinner, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

Timothy F. Noelker, Thompson Coburn LLP, St. Louis, Missouri, for defendant-intervenor. With him on the briefs was Scott F. Lane, Thompson Coburn LLP, St. Louis, Missouri.

## OPINION AND ORDER[1]

LETTOW, Judge.

This is a post-award bid protest of a task-order contract for furnishing a barracks being built in Okinawa, Japan, for the U.S. Marine Corps ("Marine Corps" or "agency"). Among the items sought to be procured by the solicitation were 364 bed-units, comprised in part of "[m]etal pop-up beds with pneumatic rams or shock absorber[s]." The contract was awarded to DCI, Inc. ("DCI"), which in due course has delivered the furniture to a government warehouse in Okinawa, where the furniture remains pending issuance of instructions from the Marine Corps to DCI for installation in accord with the work required by the contract. After the Marine Corps accepted and paid for the furniture, but before installation, plaintiff Furniture by Thurston ("Thurston") filed a bid protest in this court, alleging that the award was improper because DCI's offered beds did not conform to the solicitation.

Over the course of the litigation, two issues came to the fore. The first is the contested meaning of the term "metal pop-up bed" in

---

1. Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this action, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before February 23, 2012. The resulting redactions are shown by asterisks enclosed by brackets, i.e., "[* * *]."

the solicitation. Under plaintiff's interpretation of the term, DCI's beds were and are materially nonconforming. Under the government's reading of the specification, DCI's product is acceptable. The second major issue is what impact, if any, DCI's partial performance has on Thurston's protest. The government avers that the protest is moot because the agency has already acquired the furniture it needs. Thurston argues that because DCI has yet to install the furniture, injunctive relief is still available and appropriate.

## FACTS[2]

### A. The Solicitation

On February 17, 2011, the Marine Corps issued Request for Quotation ("RFQ") M67400–11–T–0031 for items on a General Services Administration ("GSA") Federal Supply Schedule ("FSS") contract.[3] AR Tab K; see also AR T–260.[4] The solicitation sought offers from contractors to "fabricate, transport, deliver and install" furniture for a Marine Corps barracks under construction in Okinawa, Japan. AR K–55. Specifically, the recipient of the task order placed against the FSS contract would be responsible for furnishing 364 dormitory-style rooms and a number of common areas. AR K–82 to –83; see also AR A–5 to –11. The Statement of Work provided a list of the furniture required, AR K–82 to –83, along with detailed specifications for each type of furniture, AR K–56 to –64.

The single most expensive item in the contract was the 364 beds, which together constituted 35% of the total contract price in the government's independent cost estimate. See AR C–15. The solicitation called for "[p]op [t]op" beds, i.e., a bed whose top can be lifted to access a storage space underneath. See, e.g., AR M–108 (depicting a "pop top" bed in both its "closed" and "opened" positions). The solicitation listed a number of required features or characteristics of the bed:

**1. Pop Top Bed with Bookcase and Headboard—Category 1**

- *Pop-top Bed* w/3 Drawers: size: Approximately 41″W × 82″L × 26″H[;]

- Storage Assembly: size: Approximately 11½″ D × 42″W × 64″H[;]

- Headboard features side pullout two shelf bookcase, carrel with upholstered corkboard and plug strip outlet (surge protector) and light[;]

- *Metal pop-up bed with two pneumatic rams or shock absorber (for even pull down control), thru-bolted thru end panels.* Access handle to underbed storage shall be sturdy[;]

- Removable back storage bottom panel, minimum ¾″ thick sanded plywood w/ 1¾″ dia .... ventilation holes[;]

- Side panels composed of veneer on ¾″ panel[;]

- Left, right or reversib[le] assembly to allows bed to be setup dependant on room configuration[;]

- Metal powder coated gang lock to secure all three drawers and bed platform[;]

---

**2.** The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties' evidentiary submissions. *See Bannum, Inc. v. United States,* 404 F.3d 1346, 1356 (Fed.Cir. 2005) (bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"); *Santiago v. United States,* 75 Fed. Cl. 649, 653 (2007) ("In accord with RCFC 52.1, the court 'is required to make factual findings ... from the [administrative] record as if it were conducting a trial on the record.' " (quoting *Acevedo v. United States,* 216 Fed.Appx. 977, 979 (Fed.Cir.2007))).

**3.** "The Federal Supply Schedule program, pursuant to 41 U.S.C. [§ ] 259(b)(3)(A), provides [f]ederal agencies with a simplified process of acquiring commercial supplies and services in varying quantities while obtaining volume discounts. Indefinite-delivery contracts are awarded using competitive procedures to firms. The firms provide supplies and services at stated prices for given periods of time, for delivery within a stated geographic area." 48 C.F.R. § 38.101(a). Government agencies then issue task and delivery orders against the contracts. *See* John Cibinic, Jr., et al., *Formation of Government Contracts* 1143–45 (4th ed. 2011).

**4.** The administrative record is comprised of lettered tabs with consecutive pagination independent from the tabs. Thus, "AR T–260" reflects a part of Tab T which is the 260th page from the beginning of the entire administrative record.

• Solid Wood drawer fronts, with dovetail construction and 100lb tracking[;]

• 1″ recessed back to accommodate electrical wall fixture[;]

• 18″, Fluorescent Light with one outlet strip and minimum 12′ cord. See lamps and lighting requirements[; and]

• Fabric covered tack board[.]

AR K–56 to –57 (emphasis added). As a result, the solicitation seemingly referred to the unit as a "[p]op [t]op [b]ed" and the bed itself as a "[m]etal pop-up bed." AR K–56. In addition to providing specific attributes for the unit and the bed, the solicitation also stated that, for all sleeping unit furniture, "[a]ll tops and edges shall be high-pressure laminate on a 50lb particleboard core with 3mm wood grain PVC edge banding or ¾ wood edge banding and a backing sheet." *Id.*

Besides the 364 beds, the solicitation called for approximately 2,450 other pieces of furniture, ranging from table lamps to entertainment centers. *See, e.g.,* AR K–82 to –83. The other two contract line items were the delivery of the furnishings and their installation. AR K–70 to –71; *see also* AR C–16. These services were to be provided 120 days and 135 days after contract award, respectively. AR K–69.

The solicitation provided for a best-value procurement based on two factors: technical capability and price. AR K–74. Technical capability was significantly more important than price. *Id.* However, where competing quotes were substantially equal, price could become the controlling factor. *Id.* Each offeror was also required to "clearly indicate any exceptions taken to the solicitation, or any unique approaches that may set the [o]f-

feror's quote apart from the others." AR K–68.

### B. The Award

In response to its solicitation, the government received proposals from Thurston, DCI, and [* * *] other contractors. *See* AR R–245; *see also* AR Tabs M, O, and Z. Per the solicitation instructions, Thurston and DCI submitted a technical quote with pictures, descriptions, and specifications for each type of furniture required under the contract. AR M–108 to –137; AR N148 to –172; *see also* AR K–68.

In its proposal, DCI did not indicate that it had taken a unique approach or exception to the solicitation. To the contrary, its cover letter stated that the offering "conform[s] to the specifications in every way." AR N–147. DCI included an image of its "pop top" bed in its technical quote. AR N–148. In the picture, the bed supports a mattress, which conceals the bed platform. *Id.* The product description did not specify the type of material used to construct the pop-up bed. However, at the very beginning of its technical quote, DCI stated that "[a]ll items are constructed of solid OAK." *Id.*

[* * *] offerors, including Thurston and DCI, received an overall technical capability rating of [* * *] AR T–263.[5] One of the evaluators had a few questions regarding minor aspects of DCI's proposal, *see* AR P–214, but these concerns were satisfactorily addressed by clarifications from DCI, AR Tab Q. The record contains no remarks by any agency official regarding DCI's "pop top" bed.

Given that [* * *] of the proposals had equivalent ratings for technical competency, the agency looked to price to distinguish the offers. DCI proposed to perform the con-

---

5. The proposals were evaluated using five possible ratings: excellent, very good, good, marginal, and unsatisfactory. *E.g.,* AR P–213. No offeror received a rating above [* * *] AR R245, –246; AR T–263. The two evaluators initially rated Thurston's technical capability as [* * *] AR R–245; *see also* AR O–174 to –176 (evaluation of Tomoya Gima); AR O–178 to –180 (evaluation of Daniel Batenhurst). The main criticism of both evaluators was that Thurston failed to specify how many pieces of each type of furniture it would provide. *E.g.,* AR O–180 (noting as a weakness that there was "no sep[a]rate listing

from vendor indicating q[uanti]ty"). In fact, Thurston had submitted this information as part of its proposal. *See* AR M–96. It appears that the agency simply omitted this list when it forwarded a redacted copy of Thurston's proposal to the evaluators. *See* AR Tab O. Sometime before award, however, the agency learned of its mistake. The business clearance memorandum, signed March 24, 2011, reflects a rating of [* * *] for Thurston. AR T–263; *see also* AR T–264 to –265 (listing evaluators' concerns regarding Thurston's quote, none of which relates to quantity).

tract for the lowest price, $[* * *]. AR T–263. Thurston's price was a very close second at $[* * *]. *Id.* Because of this price differential of approximately $[* * *], the Marine Corps contracting office recommended award to DCI. AR T–268. The source selection authority adopted this recommendation and awarded the task-order contract to DCI on March 24, 2011. AR Tab U.

### C. DCI's Performance

Under the original terms of the contract, DCI was scheduled to deliver the furniture by July 22, 2011, *i.e.*, 120 days after contract award. *Compare* AR U–270, *with* AR K–69. It would then install the furniture within 15 days of the delivery. *Id.* Because of delays in the construction of the barracks, the Marine Corps deferred these dates. Def.'s Opp'n to Pl.'s Mot. for a Prelim. Injunction & Mot. to Dismiss Compl. ("Def.'s Mot. to Dismiss") Ex. A. (Decl. of Leverne Redfearn (Oct. 20, 2011)) ("Redfearn Decl."), ¶¶ 3–4.[6] DCI delivered the bulk of the furniture in August 2011. *Id.* ¶¶ 4–5. The only items missing were "some blackout drapes, swivel bar seats, one table lamp, and one entertainment center." *Id.* ¶ 5. A Marine Corps official inspected and accepted the furnishings. *Id.* ¶ 4. On August 25, 2011, DCI sent an invoice to the government for the furniture and the delivery, totalling $[* * *]. *Id.* ¶ 6. Six days later the government satisfied the invoice by paying $[* * *], a sum which reflected a prompt payment discount. Def.'s Mot. to Dismiss Ex. B (Decl. of Kimberly Sakura Higa (Oct. 20, 2011)) ("Higa Decl."), ¶ 12. Currently, the government is storing the furniture in a warehouse on a Marine Corps base. Redfearn Decl. ¶ 12. The government anticipates that DCI will install the furniture once construction of the barracks is complete. *Id.* ¶ 13.

Among the items delivered were the 364 "pop top" beds. Aside from a few metal components such as locks and pneumatic rams, the beds were made of wood. Def.'s Mot. to Dismiss, Cross–Mot. for Judgment upon the Admin. Record & Resp. to Pl.'s Mot. for Judgment upon the Admin. Record ("Def.'s Cross–Mot.") at 13. Significantly, the bed platforms—which support the mattress and can be lifted to reveal the storage space beneath—are wooden.[7]

### D. Procedural Posture

Thurston submitted its protest to this court on October 12, 2011. Along with its complaint, Thurston filed an application for a temporary restraining order ("TRO") and a motion for a preliminary injunction. The court held a hearing on the TRO application on October 17, 2012, and denied the application that same day. *See* Order of Oct. 17, 2011, ECF No. 13. Along with its response to Thurston's motion for preliminary injunction, the government filed a cross-motion to dismiss the case. *See* Def.'s Mot. to Dismiss. The court deferred ruling on both of these motions such that it might consider them in concert with the parties' cross-motions for judgment on the administrative record.

On November 22, 2011, approximately one month after this protest began, Thurston filed a voluntary petition for Chapter 11 bankruptcy. *See* Def.'s Cross–Mot. Ex. A; *see also* Pl.'s Reply in Support of Its Mot.

---

6. The court has considered three declarations provided by the government for their relevance to relief, not as additions or supplements to the administrative record of the procurement decision. *See Holloway & Co. v. United States*, 87 Fed.Cl. 381, 391 n. 12 (2009) (citing RCFC 52.1 rules committee note for 2006 adoption; *Bannum*, 404 F.3d at 1354; *PGBA, LLC v. United States*, 60 Fed.Cl. 567, 568 n. 1 (2004), *aff'd*, 389 F.3d 1219 (Fed.Cir.2004)); *see also Acrow Corp. of Am. v. United States*, 96 Fed.Cl. 270, 282 (2010), *appeal dismissed*, 426 Fed.Appx. 908 (Fed.Cir.2011); *DataMill, Inc. v. United States*, 91 Fed.Cl. 722, 738 & n. 15 (2010).

7. Although not material to the disposition of this protest, Thurston reportedly learned of DCI's wooden beds in connection with a separate solic-

itation. Several weeks after issuing RFQ M67400–11–T–0031, the Marine Corps issued solicitation M67400–11–T–0039 to acquire furniture for a different barracks. Compl. Ex. 3; *see also* Compl. ¶ 15. Both solicitations required the contractor to furnish a "[m]etal pop-up bed." Compl. Ex. 3, at 10. DCI received this second task-order contract as well and subsequently delivered and installed the furniture. Compl. ¶¶ 16–17. The beds delivered for this contract were made almost entirely of wood. Compl. ¶ 21. Thurston discovered this fact and confirmed its findings by consulting DCI's GSA website, which did not list a pop-top bed with a metal frame. Def. Mot. to Dismiss Ex. D (Aff. of Michael Gittinger) (Oct. 17, 2011), ¶¶ 8–9.

for Judgment on the Admin. Record ("Pl.'s Reply") Ex. A (Decl. of Michael Gittinger) (Dec. 16, 2011) ("Second Gittinger Decl."), ¶ 3. As a result, Thurston has obtained some protection from its creditors and has gained permission to continue in operation while it undertakes a reorganization. *Id.* ¶¶ 4, 9. Thurston has retained approximately half of its workforce and is currently manufacturing furniture. *Id.* ¶¶ 7, 9. Mr. Gittinger, Thurston's Executive Vice President, maintains that the company would be able to fulfill the agency's furniture needs if the contract were awarded to it. *Id.* ¶ 10.

The parties completed briefing their cross-motions for judgment on January 4, 2012. The court held a hearing on the parties' cross-motions on January 6, 2012, and the case is now ready for disposition.

## MOTION TO DISMISS

The government's motion to dismiss raises a number of challenges to Thurston's ability to bring this action. It argues that (1) Thurston has waived the ground of its protest because the solicitation was patently ambiguous and Thurston raised no objections to the solicitation before making its offer, (2) the case is moot because DCI has already delivered the supplies at issue, (3) Thurston is barred by laches from bringing its protest, and (4) Thurston lacks standing given its recent filing of a bankruptcy petition under Chapter 11. Insofar as the latter three contentions raise jurisdictional issues, the court has considered evidentiary submissions outside the complaint and administrative record. *See L–3 Commc'ns Corp. v. United States*, 99 Fed.Cl. 283, 289 n. 4 (2011); *Knowledge Connections, Inc. v. United States*, 76 Fed.Cl. 6, 15 n. 23 (2007) (citing *Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed.Cir.1993)).[8]

### A. The Meaning of the Term "Metal Pop–Up Bed"

■ The government's first argument for dismissal of Thurston's protest rests upon the premise that the term "metal pop-up bed" is patently ambiguous. Under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed.Cir.2007), a plaintiff waives the right to protest a patent error in a solicitation if it does not raise the issue prior to award. *Id.* at 1313 ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action."). Otherwise, a prospective contractor could delay its protest until after it learned whether it had won the initial competition. *Id.* at 1314. In all events, the *Blue & Gold* doctrine turns on the existence of obvious errors or ambiguities which are apparent on the face of the solicitation.

■ Here, the government contends that a patent ambiguity exists in the phrase "[m]etal pop-up bed with two pneumatic rams or shock absorber (for even pull down control), thru-bolted thru end panels." AR K–56. The government's contention requires the court to conduct a two-step analysis. First it must determine whether the term is ambiguous. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed.Cir.2004) ("The threshold question . . . is whether the solicitation . . . is ambiguous."). A solicitation term is ambiguous if "more than one meaning is reasonably consistent with [its] language." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996). In that respect, the court must determine whether the interpretations proffered by the government and the protestor fall within the "zone of reasonableness." *Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747, 751

---

8. As described earlier, Thurston's protest relates to the award of a task order, and the court notes that it generally does not have jurisdiction over awards of task orders. *See* 10 U.S.C. § 2304c(e)(1) ("A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for [enumerated exceptions]."). Nonetheless, this statutory constraint does not apply to the court's jurisdiction over protests of task orders under GSA FSS contracts, such as the one underlying the dispute in this case. *See IDEA Int'l, Inc. v. United States*, 74 Fed.Cl. 129, 135–36 (2006) ("[The provisions of 10 U.S.C. § 2304c are] not intended to apply to protests relating to the placement of orders under GSA Federal Supply Schedule contracts."); *see also Holloway*, 87 Fed.Cl. at 390 n. 11.

(Fed.Cir.1999) (quoting *WPC Enters., Inc. v. United States,* 323 F.2d 874, 876 (Ct.Cl.1963), *disapproved on other grounds, United States v. Anthony Grace & Sons, Inc.,* 384 U.S. 424, 430 n. 6, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966)). Assuming that they do, the court proceeds to the second step of the inquiry: whether the ambiguity is patent or latent. *NVT Techs.,* 370 F.3d at 1162 ("Because we hold that the solicitation was ambiguous, we turn now to the question of whether the ambiguity was patent."). If the court finds that the ambiguity was patent, then the *Blue & Gold* doctrine applies and plaintiff's case fails. *Id.* ("Because ... any ambiguity was patent, and because it is undisputed that [plaintiff] did not inquire into such ambiguity, [plaintiff] cannot prevail."). However, if the ambiguity was latent, then the protestor is permitted to raise the issue in a post-award bid protest.[9]

■ In determining whether rival interpretations of a solicitation are reasonable, the court must "begin with the plain language of the document." *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1353 (Fed. Cir.2004) (citing *Coast Fed. Bank, FSB v. United States,* 323 F.3d 1035, 1038 (Fed.Cir. 2003) (en banc)); *see also Standard Commc'ns, Inc. v. United States,* 101 Fed.Cl. 723, 731 (2011) ("Unless it is manifest that another meaning was intended and understood by all parties, the text of the solicitation must be accorded its plain and ordinary meaning." (quoting *Linc Gov't Servs.,* 96 Fed. Cl. at 708)). An interpretation is more likely to be reasonable if it does not "leave[ ] a portion of the [solicitation] useless, inexplicable, void, or superfluous." *NASCENT Grp., J.V. ex rel. Native Am. Servs. Corp. v. United States,* 103 Fed.Cl. 338, 361 (2012) (quoting *NVT Techs.,* 370 F.3d at 1159).

The government argues that the specification of a "metal pop-up bed" requires that "the pneumatic parts ... be metal and not ... the platform." Hr'g Tr. 21:3–6 (Jan. 6, 2012);[10] *see also* Def.'s Cross–Mot. at 13 (claiming that DCI satisfied the proposal by proposing a bed with metal pneumatic rams, bolts, and lock); Def.-Intervenor's Reply to Pl.'s Resp. to Cross–Mot. for Judgment ("Def.-Intervenor's Reply") at 3 (arguing that the phrase "[m]etal pop-up bed with two pneumatic rams or shock absorbers" "simply mean[s] that the pneumatic rams or shock absorbers needed to be constructed of metal"); Hr'g Tr. 7:6–9. This interpretation is unconvincing and unreasonable. The solicitation speaks of a "pop-up bed *with* two pneumatic rams or shock absorber." AR K–56 (emphasis added). Placed between two nouns and bereft of any verbs, "with" typically means "accompanied by" or "possessing [or] having." *Concise Oxford English Dictionary* 1657 (12th ed. 2011). Thus, the solicitation term can be rephrased as a "[m]etal pop-up bed [accompanied by or possessing] two pneumatics rams or shock absorber." As a grammatic matter, the pop-up bed is conceptually distinct from either the pneumatic rams or the shock absorber. Apart from a Rube–Goldberg contraption, it would make no sense to talk of pneumatic rams accompanied by pneumatic rams, nor of a shock absorber possessing a shock absorber. Under the plain language of the solicitation, a "pop-up bed" must be something *separate from* or *greater than* the lifting and lowering apparatus. Moreover, if "pop-up bed" were identical with the pneumatic rams or shock absorber, then "pop-up bed" would serve no purpose in the sentence. This result would violate the canon of contract interpretation that disfavors rendering terms redundant. *E.g., NVT Techs.,* 370 F.3d at 1159. For these reasons, it is unreasonable to interpret "pop-up bed" as simply a synonym for the pneumatic rams or shock absorbers.[11]

**9.** Typically, patent ambiguities take the form of "major omissions, obvious discrepancies, or manifest conflicts in a solicitation's provisions." *Rotech Healthcare Inc. v. United States,* 71 Fed. Cl. 393, 405 (2006) (citing *Maint. Eng'rs, Inc. v. United States,* 21 Cl.Ct. 553, 559 (1990)), *appeal dismissed,* 214 Fed.Appx. 973 (Fed.Cir.2006). In contrast, "[a]n ambiguity is latent if it is not apparent on the face of the solicitation and is not discoverable through reasonable or customary care." *Linc Gov't Servs., LLC v. United States,* 96 Fed.Cl. 672, 708 (2010) (citing *Input/Output Tech., Inc. v. United States,* 44 Fed.Cl. 65, 72 n. 10 (1999)).

**10.** The date of the hearing will be omitted from all further citations to the hearing transcript.

Thurston interprets the phrase "metal pop-up bed" to mean the bed platform and the components that permit it to swing upwards and downwards. Pl.'s Opp'n at 6.[12] The court finds this definition well within the zone of reasonableness. Plaintiff's interpretation "gives reasonable meaning to all [of the solicitation's] parts and avoids conflict or surplusage of its provisions." *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed.Cir.2006) (quoting *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed.Cir.1997)). Unlike the government's proffered interpretation, Thurston's reading assigns a unique meaning to both "pop-up bed" and "pneumatic rams or shock absorbers." It also recognizes the difference between the terms "pop-top bed" and "pop-up bed," both of which terms are used in the specifications, apparently to mean different things. *Cf. States Roofing Corp. v. Winter*, 587 F.3d 1364, 1370–72 (Fed.Cir. 2009) (finding reasonable a contractor's understanding that different terms in a contract imply different referents).[13] Under the order of phrasing used in the solicitation, the "pop top" bed is the entire sleeping unit because the pertinent provisions of the solici-

tation are under the heading: "Pop Top Bed with Bookcase and Headboard." AR K–56. In contrast, the term "metal pop-up bed" is one of a number of bullet points under this heading, indicating that it is a component of the sleeping unit. Thurston's reading of the term, in which the pop-up bed is a component of the overall pop-top bed, is thus harmonious with the overall structure of the solicitation.

Thurston's interpretation also gives the words their plain meaning. "Pop-up" is an adjective meaning "[d]esigned to pop up or having a component that pops up[; w]ith a mechanism which causes something to pop up." 12 *The Oxford English Dictionary* 129 (2d ed. 1989); *see also The American Heritage Dictionary of the English Language* 1371 (5th ed. 2011) (defining "pop-up" as "[e]merging quickly from a recessed or concealed position when activated" or simply "[a] device ... that pops up"); *Webster's Third New International Dictionary* 1766 (2002) ("of, relating to, or having a device that pops up").[14] The term "bed" has a broader meaning. It can refer to "a piece of furniture incorporating a mattress or other surface for sleeping or resting on," or "a flat base or

**11.** At points in its briefing, the government appears to take the alternative position that the adjective "metal" in the solicitation does not refer to "pop-up bed" but rather modifies the phrase "two pneumatic rams or shock absorber." *See, e.g.,* Def.'s Cross–Mot. at 13. However, this interpretation contravenes elementary rules of grammar and is even less credible than the notion that the pop-up bed is just the lifting and lowering apparatus. The adjective "metal" is placed directly before, and thus modifies, the phrase "pop-up bed." *See* John C. Hodges, et al., *Harbrace College Handbook* 13 (12th ed. 1994) ("Generally, adjectives appear immediately before the words they modify."). One could make an argument that "metal" describes both the pop-up bed *and* the components listed thereafter; but the court cannot accept a reading in which the adjective modifies *only* the pneumatic rams and shock absorber. If the agency wished to convey this concept—*i.e.,* that the pneumatic rams or shock absorber must be metal but not the pop-up bed—it could have simply stated a requirement for a "pop-up bed with two *metal* pneumatic rams or a *metal* shock absorber."

**12.** The government characterizes Thurston's interpretation as requiring the entire bed to be composed of metal, with no wooden components

whatsoever. *See* Hr'g Tr. 6:19–20 ("[U]nder [plaintiff's] interpretation, it was supposed to be an all metal bed."). This is not an accurate description of Thurston's position, however. Plaintiff reads "[m]etal pop-up bed" to encompass the bed platform and "the portion of the bed which permits it to swing up." Pl.'s Opp'n at 6; *see also* Hr'g Tr. 27:16–17 ("[T]he government has raised a red herring about an all metal bed.").

**13.** In their affidavits, the agency contracting officials routinely ignored this distinction. *See* Higa Decl. ¶¶ 8, 10 (misquoting the solicitation as requiring a "[m]etal *pop top bed* with two pneumatic rams or shock absorbers") (emphasis added); Def.'s Reply to Mot. to Dismiss Ex. B (Decl. of Dennis James Walp (Oct. 31, 2011)), ECF No. 25–2, ¶ 7 (same). If they misread the solicitation as requiring a pop-top bed with a metal pop-top bed, that might explain their insistence that the term was patently ambiguous.

**14.** "[T]o establish the common or plain meaning of a word or term, this court has long accepted dictionary definitions." *Washington State Dep't of Servs. for the Blind v. United States*, 58 Fed.Cl. 781 (2003) (quoting *Hebah v. United States*, 456 F.2d 696, 704 (Ct.Cl.1972)).

foundation on which something rests." *Concise Oxford English Dictionary* 119; *The American Heritage Dictionary of the English Language* 159 ("[a] piece of furniture for reclining, typically consisting of a flat, rectangular frame and a mattress resting on springs"); *Webster's Third New International Dictionary* 195 ("a piece of furniture on or in which one may lie down and sleep often including bedstead, legs or supports, spring mattress, and bedding" or "a flat or level surface"). When the words are combined, then, a "pop-up bed" is a piece of furniture (or flat surface) on which one rests, with a mechanism that causes it to rise up and down. Thus the plain language of the solicitation is consonant with Thurston's understanding that the pop-up bed refers to the bed platform and the attendant components that permit the platform to open and close.[15]

Because Thurston's interpretation of the solicitation is the reasonable one and the government's reading is not, the inquiry could end. Nonetheless, the court is mindful that a particular, special interpretation of the phrase "metal pop-up bed" might exist apart from that offered by the government, perhaps derived from usage among manufacturers and suppliers of furniture. That possibility is not borne out in this instance, however. In actuality, Thurston's reading is validated by industry usage. Some of GSA's schedule contractors, including Thurston, separately quote metal pop-up beds and wooden pop-up beds. *See* Pl.'s Reply in Support of Its Mot. for Prelim. Injunction & Opp'n to Def.'s Mot. to Dismiss Ex. G (Decl. of Michael

Gittinger (Oct. 24, 2011)) ("First Gittinger Decl."), ¶¶ 6, 8. Notably, the pop-top bed with the metal platform is more expensive than its wooden counterpart. *Id.* ¶ 8. Although the eight offerors interpreted the specification for a "metal pop-up bed" in a variety of ways, none of them approached the agency for clarification.[16]

The Marine Corps itself has shown an awareness of distinctions between and among various types of pop-up beds. According to the government, "Thurston's specifications for its pop top bed product were originally used as the model for the [agency's] description of its storage bed requirement." Redfearn Decl. ¶ 9. Among the terms adopted by the Marine Corps was the requirement for a metal pop-up bed. *Id.* at ¶ 10 ("[T]he term 'metal pop[-up] bed' [was] taken from the Furniture by Thurston specification for its product.").

■ This origin of the term "metal pop-up bed" further emphasizes that, even if another industry definition of "metal pop-up bed" existed, any resulting ambiguity would be latent. Thurston can hardly be faulted for failing to question the Marine Corps' use of the term "metal pop-up bed." It had every reason to believe that its interpretation was correct, because it had originally coined the phrase. Where, as here, an agency lifts a solicitation term from an offeror's preexisting catalog and GSA FSS listing, it cannot redefine the term *sub silentio* and expect that offeror to realize the change.[17] Given the

---

**15.** Even if "metal pop-up bed" were ambiguous, it would not be patently so. There is no "facial inconsistency" between the requirement for a metal pop-up bed and any other term in the solicitation. *See LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1314 n. 6 (Fed.Cir.2009). The nearest thing to a contradiction is the requirement that "[a]ll tops and edges [of bedroom furniture] shall be high-pressure laminate on a 50lb particleboard core." AR K–56. DCI argues that the bed platform is a "top" and thus must be made of particleboard rather than metal. *See, e.g.,* Def.-Intervenor's Opp'n to Pl.'s Mot. for Judgment upon the Admin. R. & Cross–Mot. for Judgment upon the Admin. Record ("Def.-Intervenor's Cross–Mot.") at 11. The court disagrees with the government's premise that the bed platform is properly classified as a top. Indeed, due to the very nature of the bed platform, it is at all times covered by a mattress. The reference to

tops and edges (as opposed to all surfaces) suggests that this solicitation specification refers only to those parts of the bed that are exposed. Thus the RFQ's specification of a metal pop-up bed can co-exist with its requirement that all tops and edges be laminated wood.

**16.** Two of the offerors specifically proposed a metal pop-up bed. AR M–108; AR Z–616. Four offered wooden bed platforms. AR N–148; AR Z–603, –653, –725. The other two did not explicitly identify the material of the bed platform. AR Y–567; AR Z–783.

**17.** As a general rule, the court evaluates the patency of an ambiguity using the objective standard of a reasonable contractor, without regard for the contractor's actual knowledge. *See Linc Gov't Servs.*, 96 Fed.Cl. at 709 ("[T]he patency of

source for the usage "metal pop-up bed," any alleged ambiguity surrounding the term is largely imaginary and chimerical, especially insofar as Thurston is concerned, and did not impose a duty on Thurston to inquire further. Therefore the *Blue & Gold* doctrine does not apply to bar Thurston's protest.

### B. The Consequences of DCI's Delivery of the Furniture

■■■■ The government next argues that the case is moot on the ground that the court cannot grant Thurston the relief it seeks. *See* Def.'s Mot. to Dismiss at 6–8; Def.'s Cross–Mot. at 9–10. Under the case or controversy requirement of Article III of the Constitution, "[f]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971)); *see also Gerdau Ameristeel Corp. v. United States*, 519 F.3d 1336, 1341 (Fed.Cir.2008). Thus, if the court finds itself unable "to grant any effectual relief whatever" to the plaintiff, it must dismiss the case as moot. *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369 (Fed.Cir.2000) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)). However, even if a particular form of relief requested by the plaintiff is not feasible, the availability of other relief can supply the case or controversy necessary to sustain the court's jurisdiction. *Intrepid v. Pollock*, 907 F.2d 1125, 1131 (Fed.Cir.1990).

■■ The government's mootness argument fails on two separate grounds. First, even if the court could not or would not grant injunctive relief, it could still fashion other relief in the form of bid preparation and proposal costs. *See* 28 U.S.C. § 1491(b)(2) ("To afford relief in [a bid protest], the [Court of Federal Claims] may award any relief that the court considers proper ... except that any monetary relief shall be limited to bid preparation and proposal costs."). This court and others have refused to find a bid protest to be moot simply because injunctive relief might be inappropriate. *See Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 846 n. 10 (D.C.Cir.1982) ("Because the claim for damages may survive the completion of performance of the contract under challenge, this litigation is not necessarily moot even if no injunctive relief is appropriate."); *California Indus. Facilities Res., Inc. v. United States*, 80 Fed.Cl. 633, 640 (2008) ("The availability of [bid preparation and proposal costs] survives [awardee's] completion of the contract. As such, there is a live justiciable issue for this [c]ourt to decide."); *Forestry Surveys & Data v. United States*, 44 Fed.Cl. 485, 492 (1999) ("Thus, even though an injunction cannot be granted ... [plaintiff] has a surviving damages claim for bid preparation costs, attorneys' fees, and costs.").

Like the plaintiffs in those prior cases, Thurston has requested both injunctive relief and bid preparation costs. Compl., Prayer for Relief ¶¶ (b)-(e).[18] If the court were un-

an ambiguity is not determined by an offeror's actual knowledge, but rather by what a reasonable offeror would have perceived." (citing *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1475 (Fed.Cir. 1997))). However, the Federal Circuit adopted this rule to prevent contractors from unreasonably interpreting a contract clause to claim subjective ignorance of a patent ambiguity. *See Triax Pac.*, 130 F.3d at 1475. ("[Plaintiff] argues that it was not aware of the inconsistency among the contract terms at the time it submitted its bid.... To the extent [plaintiff] was unaware of the problems with the contract, that lack of recognition can be ascribed to its unreasonable interpretation of the ... specifications."). Here, Thurston is not claiming ignorance, nor has it circumvented any ambiguity by adopting an unreasonable interpretation of the solicitation terms. Rather, its actual knowledge is *greater*

than that of the so-called "reasonable offeror," and its proposed interpretation of the solicitation is perfectly reasonable given its past dealings with the government. Moreover, the government was fully aware that it was borrowing Thurston's own product descriptions and yet did nothing to alert potential offerors that it wanted to redefine those terms in an unusual way.

18. In its prayer for relief, Thurston asked the court to award it bid preparation costs "under the Equal Access to Justice Act." Compl., Prayer for Relief ¶ (e). The form of this request is flawed, because the Equal Access to Justice Act ("EAJA") makes no provision for bid preparation costs. *See* 28 U.S.C. § 2412. Rather, the court may award bid preparation costs under the Tucker Act. 28 U.S.C. § 1491(b)(2). *See generally*

able to grant the former relief, it could still award the latter. Thus "there is a live justiciable issue" for the court to decide. *See California Indus.*, 80 Fed.Cl. at 640.

Second, even if one ignores the availability of bid preparation costs, the government has not shown that injunctive relief is impossible. Granted, the government has already received and paid for the bulk of the furniture, including the contested beds. Redfearn Decl. ¶¶ 4–5; Higa Decl. ¶ 12. Yet DCI has not yet installed the furniture in the barracks. Redfearn Decl. ¶¶ 12–13; Higa Decl. ¶ 13. The government relies on *Gull Airborne*, 694 F.2d 838, and *Forestry Surveys*, 44 Fed.Cl. 485, each of which addressed performance contracts, for the proposition that injunctive relief is moot where the awardee has already substantially completed the contract. *See* Def.'s Mot. to Dismiss at 6–8; Def.'s Cross–Motion at 9–10. Unlike those performance contracts, however, here the court can enjoin the government from proceeding with the next stage of the contract, *i.e.*, installation. To be sure, such a result would entail a waste of resources on the part of the government. But such considerations go to the appropriateness of injunctive relief, not its availability. The court can give due weight to such factors if and when it finds that the government's procurement decision was irrational or illegal.

### C. Thurston's Delay in Filing Its Protest

■ The government additionally raises the affirmative defense of laches. Laches requires the defendant to prove "(1) [that] the plaintiff delayed for an unreasonable and inexcusable amount of time in filing suit, and (2) that the defendant was prejudiced as a result of the delay." *Vita–Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1333 (Fed. Cir.2009) (citing *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir. 1995)). The court calculates the period of delay "from the time the claimant knew or

should have known about [its] claim to the date of the suit." *Aero Union Corp. v. United States*, 47 Fed.Cl. 677, 686 (2000) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed.Cir.1992) (en banc)).

Here, the government has failed to prove either element of the laches defense. First, the government has not demonstrated that Thurston delayed in filing suit after it knew or should have known about deficiencies in DCI's bid. Thurston avers that it became aware of DCI's failure to adhere to the specifications of the solicitation by DCI's delivery of nonconforming furnishings for another contract which had specifications identical to the one in dispute here. *See* Compl. ¶¶ 15–25. Shortly thereafter, Thurston filed this protest. *See also* Pl.'s Reply at 9.

When distilled to its essence, the laches defense is essentially that Thurston "could have learned that DCI's product did not conform ... on March 24[, 2011] by simply looking online at the contents of DCI's contract." Def.-Intervenor's Cross–Mot. at 11–12. The salient question then is whether Thurston was put on notice that it should have taken steps to examine DCI's GSA FSS contract as of the date of the award at issue. The government has offered no proof that Thurston actually knew about the Marine Corps' acceptance of an allegedly nonconforming offer from DCI at the time of award or that Thurston should have inspected DCI's GSA schedule contract immediately after award.

■ Second, even if Thurston had tarried in bringing its protest, the government has failed to demonstrate that it was prejudiced by this delay. It claims that permitting Thurston to protest the procurement would result in serious economic harm to the agency, which has already paid DCI for the furniture it delivered.[19] As discussed *supra* re-

---

*Geo-Seis Helicopters, Inc. v. United States*, 79 Fed.Cl. 74 (2007) (awarding attorneys' fees under EAJA and bid preparation costs under the Tucker Act). Nonetheless, Thurston's prayer for bid preparation costs has been specified in the complaint. Moreover, Thurston has included the catch-all request for "such other and further relief as this [c]ourt may deem just and proper." Compl., Prayer for Relief ¶ (f).

19. Technically, a party can prevail on a laches defense by showing either economic harm or some injury to its ability to mount a defense. *E.g.*, *Magnum Opus Techs., Inc. v. United States*, 94 Fed.Cl. 512, 536 n. 18 (2010) (citing *CW Gov't Travel, Inc. v. United States*, 61 Fed.Cl. 559, 568–69 (2004), *aff'd*, 163 Fed.Appx. 853 (Fed.Cir. 2005)). Here, the government has not claimed

specting mootness, this position ignores the availability of bid preparation and proposal costs as a remedy. *See* 28 U.S.C. § 1491(b)(2). The government has offered no manner in which it would be prejudiced by Thurston's alleged delay if the court were to award monetary rather than equitable relief.

Because the government has failed to prove that Thurston delayed in filing its protest or that it has suffered significant economic prejudice, its laches defense fails. The court will, however, consider the degree to which the protested procurement has already been completed in its analysis of the factors for injunctive relief. *See CW Gov't Travel,* 61 Fed.Cl. at 570 (denying the government's laches defense but noting that the facts underlying that defense might be significant in determining whether equitable relief was appropriate).

### D. Thurston's Standing After Its Bankruptcy

Lastly, the government relies on *Avtel Services, Inc. v. United States,* 501 F.3d 1259 (Fed.Cir.2007), for the proposition that a court cannot maintain jurisdiction over a bid protest once the protestor declares bankruptcy. Def.'s Cross–Mot. at 7–8; *see also* Def.-Intervenor's Cross–Mot. at 18. In *Avtel,* the protestor sought "resolicitation or reevaluation of a contract" that had been awarded to a competitor. *Avtel,* 501 F.3d at 1260. However, while the protestor's appeal was pending, it went bankrupt, liquidated its assets, and subsequently "admit[ted] that it d[id] not have the resources necessary to perform the contract." *Id.* The Federal Circuit held that it lacked jurisdiction because, even if the protestor prevailed on the merits, it could not win the contract since it was no longer able to perform it. *Id.*

 Thurston is not in the same hapless position as the protestor in *Avtel.* Although Thurston has filed for bankruptcy, it is not selling off all its assets. Instead, the company is reorganizing itself under Chapter 11 of the Bankruptcy Code. *See* Def.'s Cross–Mot. Ex. A. "[T]he purpose of a Chapter 11 Bankruptcy is not to liquidate the debtor but

to ... facilitate the continued operation of the company so that it may improve its financial condition and eventually pay off all creditors." *Bender Shipbuilding & Repair Co. v. United States,* 297 F.3d 1358, 1362–63 (Fed. Cir.2002). Unlike the protestor in *Avtel,* Thurston has not conceded that it could not meet the agency's furniture needs; to the contrary, its vice-president has provided the court with a sworn declaration that the company "is able to manufacture the product required for the Solicitation." Second Gittinger Decl. ¶ 9. Upon filing its bankruptcy petition, the company shut down operations for one week but has since resumed manufacturing furniture. *Id.* ¶ 6. Consequently, the Federal Circuit's ruling in *Avtel* is not applicable here. *See Maryland Enter., L.L.C. v. United States,* 91 Fed.Cl. 511, 525 (2010) (declining to apply *Avtel* where plaintiff did not liquidate its assets, and receivership did not deprive plaintiff of its economic interest in the contract).

The court does not see any obstacle to Thurston's standing, notwithstanding its Chapter 11 bankruptcy. Plaintiff "has established prejudice (and therefore standing), because it ha[s] greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." *Information Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003). Its proposal was very competitive, nearly matching DCI's winning offer despite proffering a substantially more expensive metal pop-up bed. *See* AR T–263. And based on the declaration of a responsible corporate official, the court is satisfied that Thurston could perform the contract if it won a recompetition. A contracting officer could find Thurston to be responsible notwithstanding its bankruptcy filing. *See Bender Shipbuilding,* 297 F.3d at 1362 (upholding a contracting officer's responsibility determination even though the awardee was in Chapter 11 bankruptcy).

### JUDGMENT ON THE ADMINISTRATIVE RECORD

The parties' cross-motions for judgment on the administrative record primarily turn on

---

that the delay has impeded its ability to defend the case. Conceptually, that would be a difficult

showing to make for a case decided on the administrative record.

the parties' conflicting interpretations of the term "metal pop-up bed." For the reasons stated earlier, the court has concluded that the solicitation unambiguously required a bed consisting of a metal bed platform with an associated lifting apparatus. In the alternative, if the solicitation was ambiguous, the ambiguity was latent.

It is blackletter law that a procuring agency may only accept an offer that conforms to the material terms of the solicitation. *Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed.Cir.2009) ("To be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." (citing *E.W. Bliss Co. v. United States,* 77 F.3d 445, 448 (Fed.Cir.1996))). "[A] contract award based on [a materially nonconforming] proposal violates the procurement statutes and regulations." *Allied Tech. Grp., Inc. v. United States,* 649 F.3d 1320, 1329 (Fed.Cir.2011) (quoting *E.W. Bliss,* 77 F.3d at 448). A solicitation term is "material" if failure to comply with it would have a non-negligible effect on the price, quantity, quality, or delivery of the supply or service being procured. *USfalcon, Inc. v. United States,* 92 Fed.Cl. 436, 457 (2010) (citing *Centech Grp.,* 554 F.3d at 1038).

Here, the solicitation unambiguously required a metal pop-up bed, which DCI did not offer. This specification was a material term because it had a non-negligible effect on the price of the beds. Thurston offers beds with either wooden platforms or metal platforms on its GSA schedule contract. First Gittinger Decl. ¶¶ 6, 8. The price of its metal models is $[* * *] more per unit than the price of the wooden ones. *Id.* ¶ 8. If the agency had properly articulated a desire for 364 *wooden* pop-up beds, Thurston mathematically might have lowered its quote by over $[* * *]. This price discrepancy is hardly negligible, considering that DCI's winning bid was $[* * *] and it beat Thurston's offer by a mere $[* * *]. Because DCI failed to comply with a material term of the solicitation, the agency could not legally accept it.

Even if the requirement for a metal pop-up bed were a latent ambiguity, the government would be in no better a position. Under the principle of *contra proferentem,* a latent ambiguity in a solicitation will be construed against the government. *See Metropolitan Van & Storage, Inc. v. United States,* 92 Fed.Cl. 232, 267 (2010) ("[I]f [the agency] did not craft the solicitation as artfully as it should have, [the agency] will be responsible for the resulting impact on the procurement."); *see also Linc Gov't Servs.,* 96 Fed. Cl. at 708–09 (noting that contra proferentem is applicable in solicitations "if there is a genuine [latent] ambiguity that remains unresolved," *id.* at 709); *Rotech Healthcare,* 71 Fed.Cl. at 406 ("If, as the government suggests, some portions of [the solicitation] conflicted with one another, ... the conflict created, at best, a latent ambiguity which must be construed against the government, as drafter, under the principle of *contra proferentem.*" (citing *Turner Constr. Co. v. United States,* 367 F.3d 1319, 1321 (Fed.Cir.2004))). In short, the Marine Corps must bear the consequences of incorporating the term "metal pop-up beds" in the solicitation. *Cf. Metropolitan Van,* 92 Fed.Cl. at 267–68 (finding that the government acted illegally in accepting awardee's proposal since it did not comply with a reasonable interpretation of a latently ambiguous solicitation term).

The government argues that, even if the solicitation did require a metal bed platform, the agency was justified in relying on DCI's statement that its "offering will conform to the specifications in every way." AR N–147. This contention is based on the Federal Circuit's ruling in *Allied Technology Group,* 649 F.3d 1320. In that case, the court held that "[w]here an offeror has certified that it meets the technical requirements of a proposal, the [c]ontracting [o]fficer is entitled to rely on such certification in determining whether to accept [its] bid." *Id.* at 1330 (citing *Centech Grp.,* 554 F.3d at 1039). If the offeror's certification turns out to be erroneous, the defect is addressed as a matter of contract administration rather than in a bid protest. *Id.* (citing *Centech Grp.,* 554 F.3d at 1039). In short, if the agency ac-

cepts a proposal based on a misleading representation, the dispute is solely between the agency and the awardee. *See Spectrum Sys., Inc.*, B–401130, 2009 CPD ¶ 110, at 3, 2009 WL 1325352, at \*2 (Comp.Gen. May 13, 2009). An exception to this rule arises where the offeror's proposal contains other information that should lead the agency to conclude that the offeror's certification was inaccurate. *Allied Tech. Grp.*, 649 F.3d at 1330. Under those circumstances, the protestor can argue that the agency contravened procurement laws in accepting the offeror's nonconforming proposal. *Id.* at 1330–31.

The government argues that, under the rule laid out in *Allied Technology Group*, the Marine Corps was entitled to rely on DCI's representation that its offering was compliant. This argument fails in two respects. First, the contracting officials' own affidavits demonstrate that they were not misled by DCI's statement into believing that the proposal offered a conforming product, *i.e.*, a metal pop-up bed. When the agency officials evaluated DCI's proposals, they had no illusions about what was being offered: a pop-top bed with a wooden platform. *See Higa* Decl. ¶ 5 ("[T]he evaluation was conducted in a manner consistent with ... the [g]overnment's specifications for the *[p]op [t]op [b]ed being made of wood with metal pn[eu]matic rams or shock absorbers.*" (emphasis added)); Redfearn Decl. ¶ 10 ("The only metal parts required for the pop top beds are ... pneumatic rams or shock absorbers and metal powder coated gang lock."); *id.* ¶ 7 ("[T]he pop top beds manufactured by DCI meet all the [g]overnment's requirements and performance standards as stated in the Statement of Work."). Because the agency did not "rely on [DCI's representation] in determining whether to accept [its] bid," *Allied*

*Tech. Grp.*, 649 F.3d at 1330, Thurston can raise the issue in its bid protest.

█ Second, even if the instant case did fit within the boundaries of *Allied Technology Group*, the government's argument would still fail because other portions of DCI's proposal indicated that the company was offering a wooden bed platform. "Where a proposal, *on its face*, should lead an agency to the conclusion that an offeror could not and would not comply" with a specification, that noncompliance is properly the subject of a bid protest. *Allied Tech. Grp.*, 649 F.3d at 1330 (quoting *Centech Grp.*, 554 F.3d at 1039). Here, there was "significant countervailing evidence" within DCI's proposal that DCI was not compliant with the requirement for a metal pop-up bed. *Cf. Spectrum*, 2009 WL 1325352, at \*2. On the very same page in which DCI described its pop-top bed the company wrote that "[a]ll items are constructed of solid OAK and finished accordingly." AR N–148. This statement alone should have raised the question of whether the bed platform was made of metal. Moreover, nothing in DCI's description of its proffered pop-top bed, *i.e.*, DCI's entire sleeping unit, would allay this concern. *See* AR N–148 to – 149. The specifications for DCI's bed do not mention the word "metal" once. *See id.* The only indication that DCI was offering a metal pop-up bed is the generic representation that its "offering will conform to the specifications in every way." AR N–147. The agency was faced with contradictory statements: that all of DCI's furniture was made of oak, and that its offer satisfied the specification for a metal pop-up bed.[20] Under the circumstances, it was arbitrary and capricious for the agency to accept either of these claims as correct without further inquiry.[21]

---

20. For this same reason, DCI cannot cast its wooden bed platform as a "unique approach" to fulfilling the government's needs. *See, e.g.*, Def.-Intervenor's Cross–Mot. at 10. The solicitation permits offerors to "*clearly* indicate any exceptions taken to the solicitation, or any unique approaches that may set the [o]fferor's quote apart from others." AR K–68 (emphasis added). The court discounts the government's claim that this clause permits the agency to waive a material requirement for a single offeror. *See Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367–68 (Fed.Cir.1999) (finding that waiv-

ing a mandatory solicitation requirement for one offeror violated "a clearly applicable procurement statute and regulation," *id.* at 1368). However, even if the cited clause had had such a potential effect, the Marine Corps did not act on that premise to award DCI the contract.

21. Even absent this countervailing evidence, there is a question whether the agency could properly rely on DCI's representations at all. In *Allied Technology Group* and in *Spectrum*, the agencies relied on very specific certifications made by the offerors. *See Allied Tech. Grp.*, 649

## RELIEF

■ Having found that the Marine Corps' decision to award the procurement contract to DCI was contrary to the solicitation, the question of the appropriate remedy arises. In deciding whether to issue a permanent injunction, the court must consider four factors: (1) whether the plaintiff has succeeded on the merits of its case; (2) whether the plaintiff will suffer irreparable harm absent injunctive relief; (3) whether such harm would outweigh the harm to the government and the defendant-intervenor; and (4) whether an injunction would serve the public interest. *E.g., Angelica Textile Servs., Inc. v. United States,* 95 Fed.Cl. 208, 223 (2010) (citing *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir. 2004)). The court has determined that Thurston has succeeded on the merits, and thus the other three factors must also be addressed.

■ The court has repeatedly held that "the loss of potential profits" from a government contract constitutes irreparable harm. *E.g., BayFirst Solutions, LLC v. United States,* 102 Fed.Cl. 677, 696 (2012) (citing *ViroMed Labs., Inc. v. United States,* 87 Fed.Cl. 493, 503 (2009)). It is true, as the government notes, that Thurston's bankruptcy conceptually could prevent it from winning any recompetition; even if Thurston's proposal offered the best value, it might be found financially nonresponsible. *See* 48 C.F.R. §§ 9.104–1(a), 9.402(a). Yet this court has never required a protestor to prove that it was certain to *win* a contract to show irreparable harm; instead, the disappointed bidder must establish that it was in a position to compete for the contract on a reasonable basis. *See, e.g., Defense Tech., Inc. v. United States,* 99 Fed.Cl. 103, 131 (2011) ("The de-

privation of [the opportunity to compete] satisfies [protestor's] requirement to show irreparable injury" even though "the likelihood that [protestor] might have competed successfully for the contract ... seems remote."). In this instance, Thurston has shown that it has a reasonable chance of winning a recompetition: its product was rated as highly as DCI's, *see* AR T–263, its price may well be lower than DCI's, *see* First Gittinger Decl. ¶¶ 8–9, and it has continued operations despite its financial troubles, *see generally* Second Gittinger Decl. Consequently, Thurston will suffer an irreparable harm absent injunctive relief.

■ The injury to Thurston is not the only consideration before the court, however. A balance must be struck between the harm to plaintiff and that to the United States and DCI. The harm to the government has two dimensions. An injunction will delay the use by the Marine Corps of a new barracks and might require the Corps to expend many hundreds of thousands of dollars for redundant furniture. At times, such considerations are outweighed by the strong interest in "conduct[ing]" the procurement in a lawful manner." *DGR Assocs., Inc. v. United States,* 94 Fed.Cl. 189, 211 (2010); *see also PGBA, LLC v. United States,* 57 Fed.Cl. 655, 663 (2003) ("[O]nly in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests." (second alteration in original) (quoting *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 399 (1999), *appeal dismissed,* 6 Fed.Appx. 867 (Fed.Cir.2001))).

In this instance, however, the court has a mandate to give "due regard to the interests of national defense and national security." 28 U.S.C. § 1491(b)(3). Affidavits from offi-

F.3d at 1330 ("[The awardee] explicitly certified that it was compliant with Section 508 ... by submitting a signed 'Section 508 Compliance Certification,' which stated, '[t]he quote for products or services in response to this Request for Quotation [x] IS [] IS NOT in compliance with the Electronic and Information Technology Accessibility Standards.'" (second alteration in original)); *Spectrum,* 2009 WL 1325352, at *2 ("The record reflects that in evaluating [awardee's] quotation the agency found that [awardee] had responded 'yes' to the requirement set forth

in the RFQ's Vendor Solution Matrix that the '[c]ryptographic module in the product is NIST [National Institute of Standards] FIPS 140–2 compliant,' and that [awardee's] quotation also expressly provided that [awardee] 'uses a FIPS 140–2 Certified Cryptographic module in all products.'" (third and fourth sets of brackets in original)). In contrast, DCI did not certify that its pop-up bed was metal. Rather, it merely included a general statement promising compliance "in every way" in its cover letter.

cials with the Marine Corps warn that a delay in the procurement at this stage will prevent a[* * *] battalion from taking up residence in the barracks. Redfearn Decl. ¶¶ 14–17. While the Corps could find other places to house these Marines, doing so might prove disruptive to unit cohesion and morale. *See id.;* Hr'g Tr. 14:24 to 15:14. This harm does not pose the type of immediate risk to national security that peremptorily precludes injunctive relief. *Cf. Linc Gov't Servs.,* 96 Fed.Cl. at 700 (information-gathering services in Iraq were so vital to "military operations and safety of our soldiers [that] 'proper consideration of these factors alone requires denial of the requested injunctive relief,' regardless of the merits of plaintiff's case" (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 23, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008))). Nonetheless, the court must give "due regard" to this concern in weighing the balance of harms.

The second consideration is the economic harm to the government and waste of resources. This is not the typical case where the only economic injury to the government is the "burden of reprocurement costs." *See Huntsville Times Co. v. United States,* 98 Fed.Cl. 100, 122 (2011). Here, the agency has already accepted and paid for DCI's furniture, which is currently sitting in a government warehouse in Okinawa. Enjoining the Marine Corps from installing this furniture would effectively require it to reprocure furniture that is already at hand.

This court has recognized that "when a contract has been substantially completed, it is impossible, or at the least imprudent, for the court to order that the contract be rebid to a more desirable bidder." *Forestry Surveys,* 44 Fed.Cl. at 491 (citing *Gull Airborne,* 694 F.2d at 846); *see also Gull Airborne,* 694 F.2d at 846 ("If the test sets have been delivered, and satisfactorily fulfill the government's requirements, there is no justification for re-awarding the contract to a more deserving bidder."); *CW Gov't Travel, Inc. v. United States,* 163 Fed.Appx. 853, 859 (Fed. Cir.2005) (upholding a denial of injunctive relief where "a large percentage of the work on the contract has been completed and ... both the government and [awardee] have expended significant time, effort, and resources" (citing *CW Gov't Travel,* 61 Fed.Cl. at 578)); *California Indus.,* 80 Fed.Cl. at 646 (denying injunctive relief where awardee had already shipped product to the agency). The contract under dispute in this case has been substantially completed, albeit imperfectly.[22] The agency has accepted over $[* * *] worth of furniture, which it regards as acceptable for its purposes. Higa Decl. ¶¶ 5, 10. It has also paid over $[* * *] for delivery services. *Id.* ¶ 10. Enjoining the Marine Corps from installing the furniture would result in the waste of over $[* * *], to say nothing of any additional costs that would be borne by the agency in recompeting the contract. Thurston has raised no harm beyond the loss of potential profit. *See* Pl.'s Reply at 16. This injury would be dwarfed by the economic harm to the government and the need to house a Marine reconnaissance battalion in less suitable quarters. The balance of hardships weighs strongly in favor of the government.

The last factor is the public interest. It is, of course, a truism that "[t]here is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *Turner Constr. Co. v. United States,* 94 Fed.Cl. 561, 586 (2010), *aff'd,* 645 F.3d 1377 (Fed.Cir.2011). But "[i]t is equally clear that assuring the timely completion of government contracts and protecting the public fisc are strong public interests." *T & S Prods., Inc. v. United States,* 48 Fed.Cl. 100, 113 (2000) (citing *Logicon, Inc. v. United*

---

**22.** The Government Accountability Office has declined to set aside awards of substantially performed contracts, even when the product received by the agency was materially noncompliant. *See Infrared Techs. Corp.,* B–255709–2, 95–2 CPD ¶ 132, 1995 WL 550210 (Comp.Gen. Sept. 14, 1995) (granting only bid preparation costs because "[awardee] has delivered three of the four imagers to the agency," *id.* at *4, even though "[awardee's] offer was technically unacceptable," *id.* at *3); *Stocker & Yale, Inc.,* 70 Comp.Gen. 490, 493, 1991 WL 122286 (1991) (holding that "termination and recompetition [was] not a feasible remedy" because the supply contract had been "substantially performed," even though "[awardee's] proposal failed to comply with [a] material solicitation requirement").

*States,* 22 Cl.Ct. 776, 795–96 (1991)). Under the specific facts of this case, the latter concerns win out.

In light of the circumstances, the court finds that injunctive relief is inappropriate in this case. Although Thurston has prevailed on the merits and will lose its ability to compete for the contract on a fair basis, an injunction at this late stage of the procurement would exact too great a harm on the government and would not serve the public interest. Self-restraint is advisable in all bid protests, but it is all the more compelling here, where the awardee has already performed the bulk of the contract. *See, e.g., Gull Airborne,* 694 F.2d at 846. Nonetheless, Thurston is not without a remedy. Because it has prevailed on the merits of its protest, it is entitled to bid preparation and proposal costs pursuant to 28 U.S.C. § 1491(b)(2). *See PGBA, LLC v. United States,* 60 Fed.Cl. 196, 222 (2004), *aff'd,* 389 F.3d 1219.

## CONCLUSION

For the reasons set forth above, Thurston's motion for judgment on the administrative record is GRANTED in part and DENIED in part. The government's and DCI's cross-motions for judgment on the administrative record are also GRANTED in part and DENIED in part. Thurston's motion for a preliminary injunction is DENIED, as is the government's motion to dismiss. Although Thurston is denied injunctive relief, it shall recover its reasonable bid preparation and proposal costs. Thurston shall submit a reckoning of its bid preparation and proposal costs on or before March 8, 2012. The government shall respond to Thurston's submission of such costs by March 26, 2012.

It is so ORDERED.

